ESTATE OF ROBERT C. SCULL, DECEASED, THOMAS EPSTEIN AND MARIE DICKSON, EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Scull v. Commissioner
Docket No. 20201-90
United States Tax Court
T.C. Memo 1994-211; 1994 Tax Ct. Memo LEXIS 209; 67 T.C.M. (CCH) 2953; May 12, 1994, Filed *209 Decision will be entered under Rule 155. For petitioner: Thomas Epstein and Arthur Karger (specially recognized). For respondent: Steven R. Winningham and Patricia C. Dagati. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in decedent's Federal estate tax of $ 710,725.82 and an addition to tax under section 6651(a) of $ 151,303.76. Based upon expert valuation reports, respondent filed an Amendment to Answer on March 11, 1992, resulting in an increased deficiency, from $ 710,725.82 to $ 1,745,589, and an increased addition to tax, from $ 151,303.76 to $ 358,276. After concessions, [1] the issues for decision are: (1) The fair market value, as of January 1, 1986, of decedent's undivided 65-percent interest in the art collection owned by decedent, Robert C. Scull, and his former wife, Ethel Redner Scull. *210 (2) Whether the estate of Robert C. Scull is liable for the addition to tax under section 6651(a) for late filing of the estate tax return; and (3) Whether the estate of Robert C. Scull must increase taxable gifts by $ 5,000 for two checks in the amounts of $ 10,000 and $ 5,000 written by decedent to one of his sons in 1985. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect on the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Robert C. Scull (Scull or decedent) died testate on January 1, 1986, a resident of the State of Connecticut. Thomas Epstein (Epstein) and Marie Dickson are the co-executors [2] of the estate of Robert C. Scull (the estate or petitioner). At the time of filing of the petition, the co-executors were both residents of the State of New York. *211 Decedent's will was duly admitted to probate and made various bequests of cash and property to his widow, Stephanie Scull, his three sons from his first marriage, and others. One-third of the residuary estate, which included decedent's art collection, was bequeathed in trust for the benefit of his widow. Upon his widow's death, the principal of the trust is distributable to his three sons. The balance of the residuary estate passed directly to decedent's three sons, and the executors were authorized to distribute the balance of the residuary estate in kind. Background
In the late 1950s, decedent and his first wife, Ethel Redner Scull (Ethel Scull), became interested in "pop" art. During the late 1950s and 1960s, the Sculls became prominent collectors of pop and minimalist art. They began to amass one of the most comprehensive collections of modern art at the time, purchasing works of art by "pop artists" such as Andy Warhol, James Rosenquist, and Claes Oldenburg. Not only were they collectors, they were advocates and promoters of modern art. The Sculls opened a gallery in Manhattan that gave many now renowned artists their first exposure in the art world. The Sculls *212 befriended these emerging artists and acquired their works at a time when their works were not known and the prices were low. The Sculls sought the limelight and publicity for the art and themselves. Due to his patronage and taste making in the area, Scull became known as the "Pop of Pop Art". The Sculls were so popular with artists that they themselves became the subjects of many works of pop art, such as Segal's sculpture of the Sculls and Warhol's Ethel Scull 36 Times. By 1966, art museums from all parts of the world were inundating the Sculls with requests to display and/or purchase portions of their collection. The Sculls did lend many works of art to museums during the 1960s, 1970s, and 1980s. In 1965 some of the Sculls' works of art were auctioned at Sotheby Parke Bernet, Inc. (Sotheby's). The proceeds were used to establish a family foundation to help finance young, unknown artists. Another portion of the Scull collection was auctioned by Sotheby's in 1973. It was a single-owner sale entitled "A Selection of Fifty Works from the Collection of Robert C. Scull". The promotion of the 1973 auction excited extensive attention by print and broadcast media. The auction *213 yielded an unprecedented $ 2.3 million. The auction was the subject of a documentary film and was considered a milestone in the contemporary art market, demonstrating that money could be made by investing in contemporary art. In 1974, after 30 years of marriage, the Sculls separated. On April 9, 1975, Ethel Scull filed an action against Scull in the Supreme Court of the State of New York, New York County (the trial court). In her complaint, Ethel Scull sought, inter alia, a judgment granting her a divorce and imposition of constructive trusts for her benefit on the art collection owned by Scull, the proceeds of art sales made by Scull since 1973, and the real property situated in Connecticut owned by Scull. For purposes of the divorce litigation, the Sculls obtained from Sotheby's an appraisal of the fair market value of 215 items in the art collection (the 1978 appraisal). On October 19, 1981, the trial court entered a judgment and decision in the divorce action, granting Ethel Scull a divorce and other relief but dismissing her claims for the imposition of constructive trusts on the art collection, proceeds from the prior sales of works of art, and the Connecticut property. *214 Ethel Scull appealed the decision of the trial court to the Appellate Division, First Department, of the Supreme Court of the State of New York (the Appellate Division). On June 2, 1983, the Appellate Division held that Ethel Scull was entitled to the imposition of constructive trusts for her benefit. The case was remanded to the trial court for a determination of the parties' respective interests in the various properties that were subject to the constructive trusts. In February of 1984, Ethel Scull's attorney commissioned another appraisal by Sotheby's to provide high and low estimates of 175 items in the art collection (the 1984 appraisal) for purposes of determining the parties' respective interests for the constructive trust to be established. The low estimates totaled $ 4,856,400, and the high estimates totaled $ 6,792,350. In February of 1985, prior to the trial court hearing on remand, Sotheby's reexamined 10 works of art and prepared an updated appraisal (the 1985 appraisal). The 1985 appraisal is identical to the 1984 appraisal except that the values of 5 of the 10 works reexamined in 1985 and 2 additional works were increased as follows: 1984 1985 Work Appraisal
Appraisal
Johns - Out the Window
$ 1,250,000  $ 1,500,000
Johns - Two Flags 1962
1,250,000  1,750,000
Johns - Zero Through Nine
175,000  275,000
Johns - Small Black Target
140,000  175,000
Rosenquist - Portrait of
"research  the Scull Family necessary"
70,000
Kline - Blue Center
160,000  175,000
Warhol - Double Self Portrait
22,500  42,500
*215 The 1985 appraisal valued the works listed therein, in total, at a low value of $ 5,821,400 and a high value of $ 7,807,350. The 1984 and 1985 appraisals both contained a list of unvalued "paintings from 1978 appraisal not included on current list". For purposes of dividing the collection according to their proportionate shares, the Sculls stipulated that, on remand, the collection would be valued at the median of the high and low estimates on the 1985 appraisal, subject to certain credits and setoffs. On March 28, 1985, the trial court, on remand, determined that Ethel Scull was entitled to a 35-percent share of the art collection, as well as a 35-percent share of the proceeds from the sale of the works of art since 1973, and a 10-percent share of Scull's real property in Connecticut. The trial court held that the parties were entitled to the distribution of their respective interests in the art collection in kind in accordance with the following procedure. The parties were to take turns selecting pieces of art until Ethel Scull's 35-percent share was exhausted. They were to flip a coin to see who would start selecting first. There was no contemplation that the award would *216 be in the form of money. To make the in-kind distribution, the parties were to use the 1985 Sotheby's appraisal and the median figure between the high and low estimate. However, for purposes of the in-kind distribution, it did not matter whether the high, low, or median figures were used so long as a consistent basis was used to preserve the parties' respective proportionate interests in the art collection. The trial court also awarded Ethel Scull a monetary judgment against Scull in the amount of $ 1,135,371, representing her 35-percent share of proceeds from past sales, costs, and certain other adjustments, but did not include interest on the proceeds from the prior sales. On December 17, 1985, the trial court entered an amended order and judgment to reflect the parties' consents to the amendments made by the trial court in the prior order and judgment, dated March 28, 1985. The parties stipulated to the median value of the works of art and to Ethel Scull's dollar amount for purposes of making the selection. Certain other claims were severed from that proceeding and became the subject of another case by Ethel Scull against her ex-husband. On January 31, 1986, Ethel Scull *217 appealed to the Appellate Division from the amended order and judgment of the trial court, dated December 17, 1985. In her appeal, she sought to increase to 50 percent her share in all property in which constructive trusts had been imposed. She also sought an award of interest on her share of the proceeds of art sales made by Scull since 1973. In February of 1987, the Appellate Division held that Ethel Scull was not entitled to any greater percentage for her constructive trusts but was entitled to interest. The case was again remanded to the trial court for determination of the amount of interest due to Ethel Scull. The amount was determined in April of 1988. In 1989 and 1990 the remaining various claims by Ethel Scull against decedent or his estate were finally settled by the estate. On December 20, 1985, Scull had also appealed the decision of the Appellate Division, imposing the constructive trusts, to the Court of Appeals for the State of New York. The trial court granted a stay of the amended order and judgment (granting the monetary award to Ethel Scull for the prior art sales) pending Scull's appeal. On January 1, 1986, Scull died at the age of 70. At the time of his *218 death, there were over 350 works of art in the collection and, as yet, no division of the collection had been made between Scull and Ethel Scull. The estate continued decedent's appeal. In April of 1986, the Court of Appeals for the State of New York affirmed the decision of the Appellate Division as to the constructive trusts. The stay imposed by the trial court, prohibiting Ethel Scull from collecting the monetary award for the prior art sales, was automatically lifted. The Brant Agreement
In April 1986, following the lifting of the stay, petitioner attempted to raise cash to pay Ethel Scull the monetary judgment of $ 1,135,371 for the prior art sales. In the beginning of May of 1986, James Mayer, an English art dealer, advised Peter Brant (Brant), an art collector and art magazine publisher, that petitioner might be interested in selling all or part of its interest in the Scull collection prior to auction. Brant initially contacted Epstein to ascertain whether petitioner would be interested in selling certain of the works in the Scull collection. Epstein advised Brant that petitioner could not sell individual items from the collection since it did not have title to *219 any particular pieces at that time. Epstein informed Brant that petitioner owned an undivided 65-percent interest in the art collection and that Ethel Scull owned the remaining undivided 35-percent interest. Brant really just wanted certain specific items to add to his collection, but stated that he would be interested in buying petitioner's undivided 65-percent interest in the collection. Epstein provided Brant with a copy of the 1985 appraisal. Following negotiations over the weekend of May 10 and 11, 1986, Epstein and Brant entered into an agreement on May 12, 1986, for the purported sale to Brant by petitioner of its undivided 65-percent interest in the works of art listed in the Sotheby's 1985 appraisal (the Brant Agreement). The first 29 pages of the 1985 appraisal, listing the works valued in that appraisal, were attached as an exhibit to the agreement. The list of paintings from the 1978 appraisal (included in but not valued on both the 1984 and 1985 appraisals) was not included in the exhibit. At the time petitioner and Brant entered into the agreement, the works listed in the 1985 appraisal had not been divided between Ethel Scull and petitioner. Brant was represented *220 by counsel in this transaction. The Brant Agreement required Brant to purchase from petitioner and petitioner to sell to Brant for a minimum purchase price of $ 5,300,000 the works of art listed and appraised in the 1985 appraisal remaining after Ethel Scull had selected her works of art. The minimum purchase price was payable as follows: The sum of $ 1,250,000 on May 13, 1986; b) The sum of $ 2,000,000 on or before July 1, 1986; and c) The balance of $ 2,050,000 from the first net proceeds received from the auction * * * but in no event later than December 15, 1986, less the expenses of the sale and commissions as negotiated by the parties with the auction house.
The Brant Agreement further required that the works of art remaining in the estate after the division of the collection be placed for sale at public auction prior to December 1986 at Sotheby's or Christie Manson & Woods International (Christie's), as to be selected by Brant. The Brant Agreement provided that, if all works were sold at auction, all net proceeds of the auction sale in excess of $ 5,300,000 would be divided equally between Brant and petitioner, except that petitioner would not be entitled *221 to share in the excess proceeds resulting from the sale of eight of the most prized works, if such works were not selected by Ethel Scull. The agreement set ceiling prices on the eight prized items over which Brant would not have to share the excess proceeds, as follows: Out The Window
$ 2,250,000
Two Flags
2,000,000
Zero Through Nine
350,000
Small Black Target
300,000
Alphabets
500,000
Blue Center
250,000
The Charcoal Flag
100,000
Sketch for False Start
65,000
The Brant Agreement permitted Brant to bid for himself at the auction. Under the Brant Agreement, Brant also had the right to set the reserve price for each piece of art to be offered for sale at auction, subject to certain limitations. "Reserve price" is defined as the minimum price at which a seller is willing to sell the item. If all bidding fails to reach the reserve price, then the item is withdrawn from auction. On May 13, 1986, Brant made the initial payment of $ 1,250,000 to petitioner in accordance with the agreement. On May 14, 1986, the Scull art collection was divided between Ethel Scull and petitioner and distributed in accordance with the procedures set forth in the order and judgment *222 and the amended order and judgment of the trial court. On that date, Brant and Epstein met with Ethel Scull and her representatives at the warehouse where the Scull art collection was stored. Brant lost the coin toss, and Ethel Scull chose Johns' Out the Window, the most valuable work in the collection. Ethel Scull selected three more of the most prized works, including Small Black Target, Alphabets, and Blue Center, plus an additional five works. The nine items represented her 35-percent interest in the collection. Thereafter, following negotiations with both Sotheby's and Christie's, Brant and Epstein selected Sotheby's for the auction. Brant informed Sotheby's that he had purchased an interest in petitioner's share of the collection. He engaged in further negotiations with Sotheby's with respect to the terms of the proposed consignment agreement for the auction. Brant and Sotheby's agreed to mutually set a reserve price not exceeding the high of Sotheby's presale estimate for each item or lot. Prior to auction, for purposes of setting the estimates for the auction catalog, Sotheby's again reevaluated the works of art to be auctioned. The reserve prices for Johns' Two Flags *223 and Rosenquist's F-111 were set in the consignment agreement at $ 1,750,000 and $ 600,000, respectively. Sotheby's had the option to sell any lot at a price below the reserve price, provided Sotheby's paid to petitioner the net amount it would have received if the lot had been sold at the reserve price. Brant succeeded in securing Sotheby's agreement to forgo any seller's commissions and to look solely to the buyer for a commission on every sale. The consignment agreement provided: Commission. You agree to pay us a commission equal to 0% of the successful bid price for each lot sold. You authorize us, as your agent, to collect from the purchaser and retain as our commission a premium equal to 10% of the hammer price for each lot sold (the "buyer's premium"). For example, if the hammer price on a lot of the Property is $ 100,000, we will collect from the purchaser $ 100,000 plus 10% of $ 100,000 ($ 10,000) or a total of $ 110,000. We will remit to you in accordance with paragraph 3 herein $ 100,000 (the "net proceeds") and retain $ 10,000 (the "buyer's premium") for our account.
Further, to enable Brant to bid at the auction for works he personally wanted, Sotheby's *224 included in the consignment agreement and auction catalog a provision that permitted individuals who had an interest in the property to bid at the auction. Brant was responsible for, and did pay to Sotheby's, full buyer's commissions for all the works he successfully bid upon at auction. Brant and Epstein also engaged in discussions with Sotheby's concerning the various aspects of the impending auction sale, including the times when the auction would be held and the lot order of the works to be offered for sale at each session. The most valuable works of art were offered for auction, but some works were not placed at auction. Although the Brant Agreement required Brant to pay petitioner $ 2 million on or before July 1, 1986, Brant did not make that payment. He and petitioner informally agreed that the $ 2 million payment plus interest would be paid from the proceeds of the auction. Furthermore, although the agreement required Brant to pay his share of insurance and warehousing fees for the works of art, he never did so. The Auction
On November 10, 1986, the works Ethel Scull had selected were auctioned at Sotheby's for a total of $ 4,797,100. [3] Epstein and Sotheby's *225 selected 138 works of art from petitioner's collection to be auctioned in 135 lots. [4] On November 11 and 12, 1986, 119 lots of those works were sold for $ 8,639,070, representing bids (hammer prices) totaling $ 7,853,700 plus 10/percent commission fees totaling $ 785,370. Sixteen lots were returned to petitioner: two were withdrawn from the auction, and 14 were "bought-in" because the highest bids were made by Sotheby's on petitioner's behalf. The highest bids for the 14 "bought-in" items totaled $ 50,750. In addition, pursuant to the terms of the consignment agreement, Sotheby's paid to petitioner the $ 150,000 difference between the hammer price of $ 1,600,000, for Johns' Two Flags, and the reserve price of $ 1,750,000. *226 Brant's Purchases
At the Sotheby's auction, Brant successfully bid on the following works of art: Hammer
Buyer's
Lot No.
Artist/Work Price
Commission
Totals 0001
C. Oldenburg/Cake Wedge
$ 40,000  $ 4,000  $ 44,000  0002
C. Oldenburg/Sock & 15 Cents
43,000
4,300
47,300
0022
J. Johns/Charcoal Flag
320,000
32,000
352,000
0015
J. Johns/0 Through 9
800,000
80,000
880,000
0018
J. Rosenquist/(Blue Sky)
220,000
22,000
242,000
0037
M. DiSuvero/Che Faro Senza
290,000
29,000
319,000
0066
C. Oldenburg/Stocking Legs
26,000
2,600
28,600
0006
R. Rauschenberg -
90,000
9,000
99,000
Living Theater
0069
C. Oldenburg - Ray Gun
31,000
3,100
34,100
0070
C. Oldenburg - Now Media
47,500
4,750
52,250
0093
M. Heizer - Keno Cards
2,500
250
2,750
Total:  $ 1,910,000
$ 191,000
$ 2,101,000
Of the $ 2,101,000 total sales prices listed above, Brant paid only the $ 191,000, representing the 10-percent buyer's commission. In addition to the works of art listed above, Brant made winning bids (hammer prices) totaling $ 217,950 for other, unidentified works of art, for which he paid Sotheby's only $ 21,795, the 10-percent buyer's commission. Brant's *227 total hammer-price purchases amounted to $ 2,127,950 and were paid from the proceeds of the auction. The hammer price of Johns' The Charcoal Flag was $ 320,000, which was $ 220,000 more than the ceiling price of $ 100,000 set in the Brant Agreement. The hammer price for Johns' Zero Through Nine was $ 800,000, which was $ 450,000 more than the ceiling price of $ 350,000 set in the Brant Agreement. Under the agreement, petitioner was not entitled to any of the $ 670,000 of excess funds. After the auction, Brant prepared the following accounting, in accordance with the Brant Agreement, that set forth the division of the proceeds from the auction: Estate of Robert C. Scull Accounting
Accounting for Peter Brant
Gross Sales Proceeds [hammer prices]
$ 7,853,700
Sotheby's Guaranty for Two Flags
150,000
Total  $ 8,003,700
Adjustment in Peter's favor of
Item 21 [The Charcoal Flag] Sales Price 320,000
Base Price 100,000
220,000
Item 67 [Zero Through Nine]
Sales Price 800,000
Base Price 350,000
Difference 450,000
Total Credit to Peter Brant
$ 670,000  $ 8,003,700
Less  670,000
New Total  $ 7,333,700
Other Expenses
Sotheby's Expenses 3,180.00
Crozier and Eagle expenses - 4,358.50
(Photographs, etc.)  7,326,161.50
Subtract sales still unpaid 251,450.00
7, 074,711.50
Less Guaranty by Brant to Scull Estate  5,300,000.00
1,774,711.50
Peter's share: 50% of 1,774,711.50
887,355.75
Plus amount already paid
to the Estate  1,250,000.00
1,250,000.00
Plus  670,000.00
670,000.00
2,807,355.75
Less interest 82,952.00
Less paintings already bought 2,127,950.00
Balance due Peter Brant 596,453.75
Less $ 200,000 given on 12/23/86 Balance Due:
396,453.75
Accounting for the Estate Amount due Estate
$ 7,074,711.50
Less
5,300,000.00
1,774,711.50
50%
887,355.75
Plus
5,300,000.00
6,187,355.75
Less already paid
1,250,000.00
Less in escrow [proceeds of
2,000,000.00
auction held in escrow by 3,250,000.00
Sotheby's in connection with Ethel Scull's other claims against the estate] $ 2,937,355.75
*228 Brant never took possession of any of the works of art listed on the 1985 appraisal that were not offered for auction or that were offered but not sold at auction. The estate retained those works of art. The Estate Tax Return
Petitioner's United States Estate Tax Return (Form 706) was due on October 1, 1986 (9 months after the date of decedent's death). Petitioner's accountant, Richard S. Joseph (Joseph), filed an Application for Extension of Time to File U.S. Estate Tax Return and/or Pay Estate Tax (Form 4768), signed by Marie Dickson as executor. This request was granted by respondent on November 25, 1986, extending the due date for the filing of the estate tax return to April 1, 1987. Joseph was in ill health during this time and was unable to work more than a few hours a day. Another Form 4768 and a transmitting letter from Joseph requesting an additional extension of time within which to file were received by respondent on April 10, 1987. That application was not approved because extensions of time to file a return may not be granted for a period in excess of 15 months from the date of decedent's death. Epstein and Marie Dickson knew that the extended due date *229 was April 1, 1987. Epstein, as an attorney, also knew that extensions to file an estate tax return could not be granted for a period in excess of 15 months from date of death. The executors of the estate filed Form 706 on July 6, 1987. Petitioner's Form 706 was filed with the office of the Internal Revenue Service (IRS) at Holtsville, New York. The Estate's Valuation of the Art Collection
On the Form 706, the estate reported a total value of $ 4,638,411 for decedent's 65-percent undivided interest in the art collection. [5] The return divided the art collection into three categories: (1) works of art included in the 1985 appraisal prepared by Sotheby's were valued at $ 4,446,378 ($ 6,799,375 - $ 2,352,997); (2) additional paintings in the warehouse not listed in the original inventory were valued at $ 135,418 ($ 208,335 - $ 72,917); and (3) paintings sold but not listed in the Sotheby's 1985 appraisal were valued at $ 56,615 ($ 87,100 - $ 30,485). See supra note 5. In support of its valuation of the art collection, the estate attached to the estate tax return two appraisal reports, corresponding to the first two categories, and a schedule, corresponding to the third *230 category. The first appraisal report attached to the return is identical to the 1985 appraisal prepared by Sotheby's, determining total high estimates and low estimates of 143 works located at a warehouse at that time and 32 works located in decedent's home (the Sotheby's Report). The *231 Sotheby's Report represents a listing of auction estimates prepared by Lucy Havelock-Allan (now known as Lucy Mitchell-Innes) of Sotheby's. The total high estimate equals $ 7,807,350, and the total low estimate equals $ 5,821,400. These estimates were used in the trial court in determining the value of the total collection for purposes of dividing the collection in kind between Robert Scull and Ethel Scull. The total median value was stipulated by the parties in that proceeding to be $ 6,799,375. Ethel Scull's share was stipulated to be $ 2,352,997 for purposes of making the in-kind distribution contemplated by the trial court. The estate later used those stipulated median figures to determine decedent's 65-percent undivided interest in this portion of the collection, or $ 4,446,378. The report does not include the list of unvalued paintings from the 1978 appraisal referred to in the original report. It includes additional typed statements, indicating that the appraisal is for the items reported on Schedule F of the estate tax return and that the total value claimed is the "Total Medium (sic) Fixed by Court at $ 6,799,375.00". [6]
*232 The second appraisal report attached to the estate tax return is an appraisal, dated March 20, 1987, and prepared by Richard Bellamy (Bellamy), of 170 numbered items from decedent's art collection that were not listed on the 1985 appraisal report and that were not sold. In his 12-page report, Bellamy provides his qualifications and information about the Institute for Art and Urban Resources, Inc., of which he is a member of the board of directors. The remaining eight pages of the report merely list the artist and title of work, the medium of the work (i.e., acrylic on canvas), the date of production, the size of the work, and Bellamy's valuation of the work. There is no explanation as to the method of valuation or the factors that Bellamy considered in his valuation. Of the 170 numbered items, item number 138 was deleted and not identified or valued, and item number 170 is purported to be a "Box of 293 unframed dwgs. mixed media" by John Tweddle valued at $ 25 each. Also attached to the estate tax return is a schedule of works of art sold at auction that were not listed on either of the appraisals above (the Schedule). Notice of Deficiency
Prior to issuing the notice *233 of deficiency, respondent obtained valuations of certain works of art in the collection from the Art Advisory Panel of the Commissioner of the Internal Revenue Service (the Art Panel) and from Robert Bodnar, an IRS Valuation Engineer (Bodnar). In a report dated February 14, 1990, the Art Panel valued 39 of the works of art listed in the Sotheby's 1985 appraisal at $ 8,510,000. Sotheby's 1985 appraisal listed the value of those 39 items as $ 6,248,000. The Art Panel reviewed the 1985 appraisal and determined that the values of 17 items were acceptable, that 3 items had been overstated, and that the remaining 19 items had been understated. The Art Panel considered the aesthetic quality, historical importance, and the market value of the subject art in redetermining its value as of January 1, 1986. For each work of art, the Art Panel members considered the value claimed by petitioner, the presale estimate, and the sale price achieved at auction. The Art Panel's valuations were often between petitioner's values and the auction results. Bodnar valued the remaining works listed in the 1985 appraisal at $ 995,465. In the statutory notice of deficiency, respondent valued the works *234 of art listed in the Sotheby's Appraisal at $ 9,305,465, rather than $ 6,799,375 as reported in the estate tax return. The notice of deficiency did not clearly distinguish between decedent's interest and Ethel Scull's interest in the art collection, and to some extent ignored her interest. Later, in the amendment to answer, respondent asserted that in the deficiency notice decedent's interest in the art collection had been determined to have a value of $ 6,298,422. In the amended answer, based upon expert reports prepared for trial, respondent asserted that decedent's interest in the art collection had a total fair market value of $ 8,179,991 on January 1, 1986. OPINION I Valuation of Decedent's Interest in the Art Collection
Property includable in a decedent's gross estate is generally included at its fair market value on the date of decedent's death. [7]Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value has long been defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), *235 Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973). Furthermore, section 2031 and the regulations promulgated thereunder provide that fair market value is to be determined by the price at which the property would change hands in the market "in which such item is most commonly sold to the public". Sec. 20.2031-1(b), Estate Tax Regs. If the item is generally obtained by the public in the retail market, the fair market value of that item is the price at which it would be sold at retail. Id.
Since valuation is a question of fact, the trier of fact has a duty to weigh all relevant evidence of value and to draw appropriate inferences. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347. Both parties in this case have relied upon experts to derive a valuation of *236 the Scull art collection. However, due to fundamental differences in the approaches taken by the parties and their experts, particularly with respect to the use of pre-auction appraisals as opposed to actual auction sales results, the valuations determined by the litigants are quite far apart. The estate claims a value of just over $ 4.4 million for works of art that sold for $ 8 million just 10-1/2 months after the date of decedent's death. The estate bears the burden of proof in showing that the value determined by respondent in the statutory notice of deficiency is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent bears the burden of proof with respect to the increased valuation and increased deficiency asserted in the amended answer. Rule 142(a). A. The Expert Reports
1. The Bellamy Report
At trial, petitioner offered into evidence an expert report of six pages prepared by Bellamy (the Bellamy Report). [8] In that report, Bellamy summarized the testimony he intended to give at trial. [9] He stated that he would testify that there was a sharp increase in the values of contemporary art throughout all of *237 1986. Bellamy began studying works of contemporary art in 1948 and *238 became actively engaged as an art dealer in 1955. He has been associated with a number of galleries in the New York City area. He founded and currently operates the Oil & Steel Gallery in Long Island City, New York. Bellamy personally knows a majority of the artists whose works were in the collection and has either represented some of those artists or has exhibited or sold some of their works. By art world definitions, to "represent" an artist means to be the main dealer and promoter of that artist's works. Bellamy performed the original appraisal of the approximately 169 works of art and 293 rolled-up drawings stored at the Crozier warehouse. Of those works, 60 paintings and all 293 of the drawings were created by John Tweddle. Bellamy was Tweddle's agent in the 1970s. Bellamy stated that there was hardly any market for Tweddle's works. In 1984, four to six Tweddle works were put up for sale by Sotheby's, but none was sold. In addition, no paintings were sold at an exhibition of the artist's works by the Blum Helman Gallery around the same time. Epstein and Bellamy decided that none of these Tweddle works would be offered at the auction for fear of depressing the value *239 of the other works. Bellamy concluded that his appraisal of the Tweddle works was generous. Of the remaining works stored in the warehouse, there was a substantial number of sculptures by William Crozier. Crozier was represented by the Xavier Fourcade Gallery from September of 1980 until 1987. Bellamy stated that, during that time, he knew of only two sales of this artist's works. The Fourcade Gallery came to own casts of practically all of Crozier's works in lieu of repayment of the monthly stipend paid to the artist. At the Fourcade Estate's auction, these Crozier works either did not sell or sold at a loss. Crozier had an exhibition at the Jason McCoy Gallery in December of 1990 and January of 1991, and nothing was sold. Bellamy again concluded that his appraisal of the Crozier works was generous. In addition, Bellamy discussed two works of art created by Dan Christensen, which Bellamy had earlier appraised at $ 6,000 each. They were stored in the LeBron warehouse. He stated that decedent had planned to have those paintings stretched, mounted, and framed, but just never had gotten around to it. At the time of decedent's death, there were substantial outstanding warehousing *240 fees. Since the Christensen works had become damaged during storage, Bellamy suggested to the co-executors that they try to arrange with the warehouse that it keep the paintings in satisfaction of the outstanding fees. Bellamy concluded his report with the following observations: I do not wish to burden the Court with a discussion of the many other artists involved. I will, of course, be able to respond to questions about the other artists at the trial. In the 706 Estate Tax return, my appraisal was stated to be $ 208,355 [sic]. * The local art appraiser noted that the correct figure was $ 151,055 because of a duplication of items valued in Sotheby's appraisal and because of a mathematical error. The total of $ 151,055, instead of $ 208,355 [sic], * appears to be the correct value of my appraisal of the works in the warehouse at the time of Mr. Scull's death. 2. The Castelli Report
Petitioner also offered a six-page expert report prepared by Leo Castelli *241 (Castelli) who testified at trial. Castelli was born in 1907 in Trieste, Italy, and, at an early age, developed an interest in the arts, especially contemporary art. In 1957, he opened the Leo Castelli Gallery in New York City and has operated it continuously to the present. Among many other artists, Castelli has represented and/or dealt in the works of Nassos Daphnis, Jasper Johns, Robert Morris, Bruce Nauman, Robert Rauschenberg, and James Rosenquist. He also represented Andy Warhol until Warhol's death and formerly represented Larry Poons, Cy Twombly, Claes Oldenburg, and Richard Artschwager. In preparing his report, Castelli reviewed the Sotheby's report attached to the estate tax return as well as the report prepared by the Commissioner's Art Panel, dated February 14, 1990, and a letter signed by Richard S. Wolf, vice president of Sotheby's. [10]
*242 After noting that "the art market in general experienced a sharp increase in value in 1986 and continuing thereafter", Castelli opined that "the fair market values of the works at the time of the auctions rose appreciably during the eleven months after Mr. Scull's death." Castelli noted that during the 1980s and continuing until 1989, the prices of many of the artists represented in the Scull collection rose steeply as more and more investors were attracted to the art market as an area for investment. He stated, "This upward rise continued all through 1986 and had a definite effect on the increase in the fair market value of these works between January, 1986 and November, 1986." However, Castelli did not attempt to quantify this "appreciable" or "steep" increase. Castelli also stated that the name Scull generated tremendous publicity for the auction, added excitement, and resulted in higher bids at auction: "And it is my further opinion that this interest [in the Sculls themselves as collectors and encouragers of contemporary art] added to the prices bid at the auctions, over and above the fair market value of those works, at the time." Castelli concluded that the 1985 appraisal *243 by Sotheby's, as modified, represented the fair market value of the works therein listed as of the date of decedent's death. He also stated that the estate's estimate of $ 87,100 for the 13 works that were not in the Sotheby's appraisal but were in the auction catalog and were sold at auction represents the fair market value of those works. [11]
3. The Carolan Report
Respondent's expert, Karen E. Carolan (Carolan), is chief of the Art Valuation Section of the Internal Revenue Service (IRS) and chairwoman of the Commissioner's Art Panel. Carolan has published numerous articles on documenting and valuing art for Federal tax purposes and has participated in lectures and panel discussions concerning the valuation of art. Her areas of specialization are late 19th and 20th century American and European paintings and sculpture, American western art, and 20th century decorative arts. On February 26, 1992, Carolan and respondent's second expert, Ivan C. Karp (Karp), examined *244 and valued the items in storage at the Crozier warehouse. Carolan prepared an appraisal report, dated March 3, 1992, expressing her expert opinion as to the fair market value of decedent's total interest in the art collection at the date of his death as approximately $ 8,180,000. Carolan used the hammer prices obtained at auction on November 11 and 12, 1986, plus the 10-percent buyer's commission paid to Sotheby's, discounted by 15 percent, to arrive at a valuation of $ 7,512,100 for petitioner's works sold at auction. Karp's Report, discussed below, covers the balance of the $ 8,180,000. Carolan opined that it was reasonable and preferable to use the November 1986 auction results in determining the date of death valuation of decedent's 65-percent interest in the art collection. In evaluating the outcome of the auction, Carolan noted that: The record prices achieved at the November 1986 Scull sale were not an anomaly. Robert Scull was a legendary collector of pop and minimalist art. The quality of the Scull Collection was well known in the art community, and, historically when works from the Scull collection had been offered for sale, such as the auction of 50 works in 1973, *245 record prices were achieved. Considering the provenance and quality of the works at issue, high prices would have been anticipated for the 1986 sale. The conclusions of the IRS in the notice of deficiency were very conservative, and, a better case could arguably be made that the sales prices were in fact, the best evidence of fair market value. At the time of the IRS determination certain facts, such as the Brant purchase and the date of the appraisal on which the returned values were based were not known. The argument for higher values, closer to the sales prices, is supported by the previous sales of other Scull works, the date of the returned values to 1984 or 1985, the $ 5.3 million sale of a 65% interest of the collection in May 1986 by [sic] P. Brant, the state of the contemporary art market in 1986, and public and private sales of other works by these artists near the valuation date.
Carolan further elaborated on those aspects of the collection that she considered in her valuation: (1) Scull's reputation as a collector and advocate of pop art -- Both Robert and Ethel Scull became legendary collectors of pop and minimalist art. The Sculls assembled one of the most *246 comprehensive collections of modern art in the 1950s and 1960s. They were publicity seekers and succeeded in raising the stature of the artists whose works they chose to nurture. Thus, there came a time when a new work or artist chosen by the Sculls gained quick acceptance in the pop art world. (2) The effect of provenance (i.e., history of ownership) of the items in the collection -- The provenance of a piece of art also factors into its valuation. A buyer is reassured by acquiring a work that has been preselected by someone with, developed taste. Hence, a work of art from the Scull collection would sell at a premium compared to similar items from a no-name collection. (3) The results of the 1973 Scull auction -- This auction was heavily publicized and, for the time, yielded astonishing prices and price records. Fifty pieces of art sold for a then unprecedented $ 2.3 million. Many art critics found this sale to represent a landmark event in auction history. It provided "a standard against which all future sales of contemporary art would be measured, both in terms of the quality of the material sold and the overall success of the sale." (4) The lure of single-owner sales *247 -- Single-owner sales give collectors an opportunity to own pieces from the collection of a renowned collector. (5) The steady growth of the art market during 1986 and 1987 -- By 1986, the auction market for modern art had been strong for a number of years and was steadily growing. Publicity and "hoopla" were the norm during this period. Catalogs displaying items to be auctioned with color illustrations and extensive research notes were themselves becoming collector's items. The auction market attracted the press and became the place to buy and sell art. The Sotheby's Art Index, which tracks prices in different sectors of the art market in nominal dollars, illustrates this phenomenon. The index shows a steady but undramatic increase in contemporary art from 1980 to the beginning of 1987, about a 10-percent increase per year from the beginning of 1985 to the beginning of 1987. Not until 1987 does the steep rise in contemporary art prices begin, and super record prices were not achieved until 1988. (6) The Brant Agreement -- Carolan characterized the Brant Agreement as unusual and, "Given the circumstances and the significant restrictions and conditions, it [the Brant Agreement] *248 would not appear to be indicative of fair market value as defined, but appears to represent a distressed sale." She noted that Brant nevertheless was willing to purchase the 65-percent interest, with all of these difficulties and restrictions and without knowing what specific works of art would be left in that interest, and paid almost $ 1 million more than the estate valued decedent's interest, even before the additional sales proceeds. (7) The 1986 auction and its results -- The Scull collection was well known and considered to be of top quality. The auction yield set a record for a single-owner sale of contemporary art. Carolan stated that "I have attended the day and evening Contemporary Impressionist and Modern sales since about 1974 or 1975, and I attended the Scull sales in 1986. The publicity and promotion for this sale were not unique to the Scull sale, but typical and similar to that for other important collections." (8) The presale estimates -- Carolan stated that, in strong market conditions, she has observed that presale estimates are often low, probably to encourage buyers. She quotes Christie's Martha Baer from her proposal for the Scull sale, dated June 19, 1986: *249 Please note I have changed some of the estimates as I have had a chance to do further research on auction prices for these artists. However, as you will see I am still quoting conservative estimates for the most part as I feel they entice active bidding.
(9) The relevant public and private sales in proximity to the valuation date -- Carolan stated that many of the highest prices achieved, while not previously achieved at auction, are nevertheless supported by private sales during the period. Carolan points to a number of newspaper articles in which Lucy Mitchell-Innes herself commented on the remarkable quality of the pieces by Johns and other artists in the Scull collection and how she was not surprised by the prices achieved at auction. In comparing relevant private sales occurring during the same period, Carolan concluded that the prices achieved for Johns' Out the Window, Warhol's Two Hundred One Dollar Bills, DiSuvero's Che Faro, and Rosenquist's F-111 are not out of line or extraordinary and that the preauction estimates appear too low. Carolan concluded her report by stating: In conclusion, the quality of the Scull Collection was well known by the art buying *250 community. The past history of the sales of other Scull works confirm[s] that works from the Scull collection were esteemed and achieved high prices in the market. The subject properties sold at auction only ten months after the valuation date. In view of the contemporary art market in 1986, while there was an increase, no substantial or dramatic change in market conditions was observed between the date of death and the sale date. Consequently, I do not believe that the subject works doubled in value in these ten months. Whether the sale had taken place in January or in November, the results would probably have been much the same. The high prices achieved for the sale of these works ten months after the valuation date were not, as has been demonstrated, unexpected with no basis in reality. The values indicated in the IRS deficiency were very conservative and, after conducting extensive additional research for this report, probably too low. Using the 10% increase in contemporary art prices indicated in the Sotheby's Index as a benchmark, I would estimate that only about a 15% reduction of the sales prices would be warranted at the valuation date.
4. The Karp Report
*251 Ivan C. Karp (Karp) submitted an expert report, dated March 3, 1992. Karp opened the O.K. Harris Gallery in New York City in 1969 and has been its director since that time. Karp was assistant director of the Leo Castelli Gallery from 1959 to 1969. Karp has lectured and published extensively on art and has taught art history courses. For purposes of his valuation, Karp has considered the collection in two parts, the works of art sold at auction and the works not offered at auction. In reaching his conclusions, Karp considered the appraisals attached to the estate tax return, the auction catalog and sales results, the 1978, 1984, and 1985 appraisals prepared by Sotheby's, the Brant Agreement, and contemporaneous sales data and publications. Karp and Bellamy agreed on the valuations of various of the works of art not offered at auction and contained in the Bellamy Report. On most of the remaining works in this category, Karp's valuations were between Bellamy's and Bodnar's. Karp has known Bellamy over 35 years and respects his vast knowledge of contemporary art; however, Karp explained that he must challenge certain of Bellamy's valuations because Bellamy focused on aesthetics *252 and not the economics of the art market. On the other hand, Karp found the values set forth in the notice of deficiency to be rather high at times because Bodnar based his valuations strictly on economics and comparative sales with little regard for artistic merits or the lack thereof. For example, Karp reduced the values for the works of John Tweddle, as determined in the notice of deficiency, by 50 percent, to account for blockage and unevenness of quality. Karp opined that the fair market value of all of these works (not offered at auction and contained in the Bellamy Report) on the date of decedent's death was $ 323,150. Karp's valuation of the works of art contained in the 1985 appraisal by Sotheby's but not offered at auction was lower than the valuation determined in the notice of deficiency but higher than the median value claimed on the estate tax return. Karp explained: The difference between my valuation and that claimed on the estate tax return is largely explained by the fact that the estate's valuation is based upon the March 1985 Sotheby's appraisal which, as regards these works, is identical to an appraisal prepared by Sotheby's in February 1984. In essence, *253 the values claimed by the estate for these works are average values circa February 1984, two years before the applicable valuation date. My values are my appraisal of the fair market value of the works circa January 1, 1986 which I note, are very close to the "high estimates" of $ 208,650 on the 1984/1985 Sotheby's appraisals.
Karp concluded that the fair market value of these works as of January 1, 1986, was $ 219,800. Karp also discussed the outcome of the auction. He suggested that only an uninformed observer would think that the prices achieved at auction were unexpected in view of the presale estimates. Karp asserted that, by 1986, the art world had been awash for at least 2 years in a flush of excited prices for fine art in all categories. Karp concluded that Sotheby's placed low estimates on pieces in the Scull collection -- to create the same degree of astonishment at the prices achieved as occurred in the first (and by then historic) auction of Scull works. There was no one involved in contemporary art commerce who was not aware that the Jasper Johns, 0 Through 9 painting would achieve over $ 750,000. And to have estimated the monumental James Rosenquist *254 F111 at less than $ 1,000,000 was a serious lapse in judgment. One might ascribe this kind of estimating to a failure of information gathering or to a sudden burst of overcautiousness. But research is one of the strong points of the major auction houses. And 1985 to 1986 was not the moment or the environment for fine arts price anxiety. New records for the sale of art was a daily occurrence and none of this was anything but known to everyone involved.
Karp also stated that respondent had generously taken into account the 10 months between the date of valuation and the date of the auction sales by discounting the auction results by 15 percent. He also saw "in the Peter Brant arrangement that this veteran collector held an accurate and realistic conviction as to the prevailing value of the works in question." Karp found that this esteemed collection could have sold at Christie's or, for that matter, in Europe or in a private home and achieved the very same results. Thus, Karp concluded that, with the 15-percent discount, decedent's 65-percent interest in this portion of the collection was worth $ 7,512,091. As for the works of art offered but not sold at the auction, *255 Karp accepted the $ 59,950 figure from the notice of deficiency, since that was lower than the value claimed on the estate tax return and lower than the presale estimates. Karp also found additional works of art at the warehouse that had not been reported on the estate tax return or included in any of the appraisals or statements relied upon by petitioner. He valued these items at $ 65,000. B. Positions of the Parties
Respondent contends that it is reasonable and preferable to use the November 1986 auction results in determining the date-of-death value of decedent's 65-percent interest in the art collection sold at the auction. Respondent further asserts that the values determined by Carolan and Karp for the remaining works of art represent the date of death values for those works. Petitioner asserts that it has met its burden of proving that it correctly reported the value of the estate's undivided interest in the art collection, as of the date of death, on the Form 706 based upon the median value between the high and the low estimated values as determined by Sotheby's in its 1985 appraisal. Petitioner reasons that, on the date of decedent's death, decedent did not have *256 title to any of the individual works of art in the Scull collection. As determined by the New York State trial court, decedent possessed only an undivided 65-percent interest in the collection, and Ethel Scull possessed the remaining 35-percent interest. The 1985 appraisal prepared by Sotheby's valued 175 numbered items of art and fixed the high and low estimated values for each individual piece. The trial court's judgment provided that the collection be divided in kind on the basis of the median values between the high and low estimated values, with petitioner and Ethel Scull alternately selecting works until Ethel Scull's selections had reached a value equivalent to 35 percent of the median value of the entire collection. Petitioner emphasizes that no such division could have been made on the date of death or for 4 months thereafter due to the trial court's stay of judgment pending the determination of the appeal taken by decedent to the New York State Court of Appeals. Therefore, in view of the nonfungible nature of the collection as of the date of death, petitioner asserts that the fair market value was actually less than the proportionate share of the value of the entire *257 collection and that the median value of the 1985 appraisal is the most appropriate valuation available in this case. In addition, petitioner further asserts that the sale [12] of the estate's interest in the collection to Peter Brant for $ 5,300,000, on May 12, 1986, provides strong evidence of the value of decedent's undivided 65-percent interest in the art collection on that date. Furthermore, petitioner states that the agreement demonstrates the substantial price rises in the art market between January, May, and November of 1986. Petitioner states that the Brant Agreement represents a bona fide sales transaction voluntarily entered into as a result of arm's-length negotiations *258 by willing and informed participants. Petitioner relates that, although Epstein was at the time trying to raise funds to pay Ethel Scull the approximately $ 1.2 million money judgment for the earlier art sales awarded by the New York State trial court, this Brant sale was not a forced or distress sale. In fact, Epstein succeeded in obtaining a price, $ 5,300,000, that is almost $ 225,000 higher than 65 percent of the total high value of the works of art as estimated by Sotheby's in the 1985 appraisal. Even though there was the possibility that the auction yields would exceed $ 5,300,000 and the estate would share in that excess, petitioner argues that this possibility was purely speculative and that decedent's undivided 65-percent interest had a fair market value of $ 5,300,000 on May 12, 1986. Consequently, petitioner asserts that the Brant Agreement serves as strong evidence that petitioner properly reported the fair market value of decedent's interest on Form 706 in view of appreciation in the art market during the intervening period. We note that the art collection was in fact divided between the estate and Ethel Scull on May 14, 1986. Respondent characterizes the Brant *259 Agreement as a wholesale transaction that yielded $ 7,098,451 [13] for works that sold at retail for $ 8,638,905. Respondent contends that the best evidence of the fair market value of those works of art that sold at the November 1986 auction is the amount paid by the purchasers of the art at the auction. Respondent asserts that both the hammer prices and the buyer's commissions should be included in the fair market value of the works of art sold at auction. Respondent's position [14] is that the fair market value of an item of property is measured by what would be paid for the item, not by the net amount received by the seller. *260 Petitioner counters that, if the auction results are to be used to determine fair market value, then only the hammer prices should be used. Petitioner further asserts that, if the auction results are to be used to determine value as of the date of death, an appreciation allowance must be made. Petitioner argues that there was "substantial" appreciation in the works of art represented in the Scull collection between January and November of 1986. Respondent agrees that there was some appreciation in works of art during the period from January to November of 1986. Respondent asserts, however, that such appreciation did not exceed an average rate [15] of 15 percent for that period. *261 C. The Court's Valuation
We agree that, on January 1, 1986, decedent did not have title to any of the individual works of art in the Scull collection. Rather, decedent owned a 65-percent undivided interest in the entire collection. Therefore, we think it is appropriate to value the entire collection, including the pieces selected by Ethel Scull, as of the date of decedent's death and then determine the value of decedent's 65-percent undivided interest. The Court often finds expert witnesses' opinions to be helpful in understanding an area requiring specialized training, knowledge, or judgment. [16] However, as the trier of fact, the Court is not bound to accept the experts' opinions. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may adopt some portions and reject other portions of expert testimony as we weigh its persuasiveness and helpfulness. Helvering v. National Grocery Co., 304 U.S. 282 (1938). In fact, where both parties' valuations are defective, the *262 Court independently may reach a valuation determination. Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244; Goldstein v. Commissioner, 298 F.2d 562, 567 (9th Cir. 1962), affg. T.C. Memo. 1960-276. In this case, we evaluate the estate's undivided 65-percent interest in the art collection in four separate categories: (1) works of art offered and sold at auction on November 10, 11, and 12, 1986, by petitioner and by Ethel Scull, (2) works of art offered but not sold at auction, (3) works of art included in the 1985 appraisal but not offered at auction, and (4) works of art not included in the 1985 appraisal and not offered at auction. 1. Works of Art Offered and Sold at Auction
We do not *263 agree with petitioner's positions. This Court has recognized that an appropriate retail market for art objects is the auction (distinguished from a forced-sale auction). Estate of Smith v. Commissioner, 57 T.C. 650, 658 (1972), affd. 510 F.2d 479 (2d Cir. 1975); Mathias v. Commissioner, 50 T.C. 994, 999 (1968). Petitioner's expert, Castelli, acknowledged that the proper market for the decedent's collection was the auction market. We prefer evidence of actual sales of the property to be valued, within a reasonable period of time before or after the valuation date, rather than estimates or approximations of the price upon which a willing buyer and a willing seller might agree. Cf. Tripp v. Commissioner, 337 F.2d at 434-435. Foreseeable subsequent sales will be considered for date-of-death valuations, and no evidence is more probative of fair market value than direct sales of the property in question. Estate of Kaplin v. Commissioner, 748 F.2d 1109, 1111 (6th Cir. 1984), revg. T.C. Memo. 1982-440. *264 In addition, we often look to an ultimate disposition in valuing a fractional interest. See Andrews v. Commissioner, 38 F.2d 55, 56 (2d Cir. 1930), affg. 13 B.T.A. 651 (1928) (Board of Tax Appeals justified in valuing a decedent's fractional interest in property at the price at which it sold 14 months after death). In this case, works from the Scull collection were sold at auction on November 10, 11, and 12, 1986, 10-1/2 months after decedent's death and 8 months before the estate tax return (Form 706) was filed. On November 10, 1986, Ethel Scull offered for auction the nine works of art she had selected from the collection. All nine works were sold, yielding $ 4,797,100, which includes buyer's commissions. On November 11 and 12, 1986, petitioner offered 138 works and sold 119 lots at auction, yielding hammer prices of $ 7,853,700 and 10-percent buyer's commissions of $ 785,370, totaling $ 8,639,070. Petitioner's valuation is based upon appraisals prepared 10 months to 2 years prior to decedent's date of death. Those appraisals are merely Sotheby's estimates of the values of certain works for purposes of division of *265 marital property in kind between decedent and Ethel Scull. Those appraisals do not disclose the basis upon which the values were estimated and do not constitute expert reports or expert valuations in this case. Furthermore, the values in the appraisals do not incorporate any appreciation that occurred up to the date of death. Petitioner further objects to using the auction results as a means of valuing the works of art for estate tax purposes in light of the Brant Agreement. Other than the buyer's commissions that Brant paid directly to Sotheby's for his purchases at the auction, Brant's total cash-out-of-pocket expenditure under the Brant Agreement was $ 1,250,000, the initial payment to the estate. In addition to the $ 1,250,000 which he actually paid, Brant was credited with $ 670,000 of the auction proceeds in which the estate did not participate and with $ 887,355.75 of the excess proceeds of the auction above the $ 5,300,000 minimum figure guaranteed to the estate, for a total of $ 2,807,355.75. From this total was deducted the $ 2,127,950 hammer prices for the works Brant purchased at the auction and the $ 82,952 interest on the delayed $ 2,000,000 payment, which payment *266 also came out of the auction proceeds, for a balance of $ 596,454. Thus, for a cash expenditure of $ 1,250,000, Brant received works of art with a hammer price of $ 2,127,950 and $ 596,454 in cash. After payment of the buyer's commissions of $ 212,795, Brant had the works of art plus $ 383,659 in cash. If the Brant Agreement constituted a sale of the Scull art collection rather than a financing arrangement, it was a bargain sale at less than the fair market value of the works. The facts do not show that Brant really assumed the benefits or burdens of ownership. He did not make the $ 2,000,000 payment that was due in July 1986; he did not pay any of the warehouse or insurance expenses for the collection; he did not take any of the works of art that were not sold at the auction. However, we need not decide whether there was a bona fide sale under the Brant Agreement. See supra note 12. We think that the Brant Agreement, however it is characterized, actually supports the use of the auction results. Throughout the period after decedent's death, an auction of the Scull collection was contemplated and planned. This plan did not change with the appearance of Brant. In fact, *267 Epstein negotiated to continue the plan for auction and to share in the auction yields in excess of $ 5,300,000. Petitioner and Brant were assured of getting at least four of the eight most prized pieces of the entire collection due to the alternating method of dividing the collection. Ethel Scull did select four of those eight most prized pieces, plus five others, to reach her 35-percent interest in the collection. We agree with respondent's characterization of the Brant Agreement as a wholesale transaction. Furthermore, the Brant Agreement is strong evidence that petitioner did not properly value decedent's interest in the collection on the estate tax return. The Brant Agreement, nevertheless, is not a conclusive indication of the proper value of decedent's interest. Considering all aspects of the Brant Agreement, including the contingencies, we think that a valuation based upon the Brant Agreement would necessitate incorporation of the auction results. Petitioner asserts that, if the auction results are to be used to determine fair market value, then only the hammer prices should be used and a substantial appreciation allowance should be made. Respondent asserts that both *268 the hammer prices and the buyer's commissions should be included in the fair market value of the works of art sold at auction. See supra note 14. We agree with respondent. The fair market value of an item of property is measured by what would be paid for the item, not on the net amount received by the seller: "'price' herein is what a purchaser would pay for a piece of * * * [property]". Estate of Smith v. Commissioner, 57 T.C. at 659. In that case, the taxpayer argued that, in determining fair market value, the value of the unsold works of art of a deceased sculptor should be reduced by the commissions payable to decedent's exclusive agent. This Court rejected that argument and held that "The measure of value laid down by these cases is what could be received on, not what is retained from, a hypothetical sale." Id.; citing Publicker v. Commissioner, 206 F.2d 250 (3d Cir. 1953); Estate of Gould v. Commissioner, 14 T.C. 414 (1950)). Although, in this case, the estate was not obligated, as was the taxpayer in Estate of Smith v. Commissioner, supra, *269 to pay the commissions out of the gross sales price received, we think that the situations are analogous and the net effect is the same. Each buyer considered how much to bid by taking into account the additional 10-percent buyer's commission. As a result, these different considerations yield one price for an item that takes into account the buyer's bid price and the buyer's commission. Petitioner argues that it only "received" the hammer prices from the sale of the art pieces. We disagree. The estate constructively received the buyer's commissions. The amount received includes money and the fair market value of property received. In this context, property includes services. Therefore, even under petitioner's argument, the amount that petitioner received as a result of the auction was not only the hammer prices but also Sotheby's services. Sotheby's was petitioner's agent at the auction and had an obligation to use its best efforts to obtain the highest bid for each item. Sotheby's did not represent the purchasers of the items. An agent of a purchaser would have had an obligation to obtain the item at the lowest possible price. The consignment agreement authorized *270 Sotheby's to act as petitioner's agent to collect from the purchaser and retain as Sotheby's commission 10 percent of the hammer price. Brant negotiated this provision of the consignment agreement with Sotheby's, shifting the focus of the collection of the commission from the seller to the buyer. This provision does not substantively change the determination of the value of the works of art: it merely represents Sotheby's mechanism for collecting and accounting for the commissions. Therefore, we sustain respondent's computation of the fair market values of the items sold at auction as of November of 1986 as a combination of the hammer prices and the buyer's commissions paid. Petitioner further asserts that, if the auction results are to be used to determine value as of the date of death, an appreciation allowance must be made. Petitioner argues that there was "substantial" appreciation in the works of art represented in the Scull collection between January and November of 1986. Respondent agrees that there was some appreciation in works of art during the period from January to November of 1986. Respondent asserts, however, that such appreciation did not exceed an average rate *271 of 15 percent for that period. Respondent's experts testified as to the state of the contemporary art market during the mid-1980s, and specifically 1986, by referring to contemporaneous publications as well as their own personal experiences during the period. Karp testified that much of the appreciation that occurred during 1986 was due in large part to the availability of the Scull collection at auction. He stated that "I don't think a lot of these things are worth the price paid for them, [but] that was the price paid and that is the fair market value according to the strictures of fair market value." Carolan further asserted that the data supports the contention that the auction results achieved in November could also have been achieved had the auction been held in January of 1986. Both of respondent's experts recognize that the results of effective publicity and "hoopla" cannot be separated from the concept of fair market value. Cf. Perdue v. Commissioner, T.C. Memo. 1991-478 (fair market value determined by what a willing buyer will pay even under the influence of the "glamour" of the particular sale and the "romantic appeal" and "glamour" *272 of the object offered for sale). We found the contemporaneous data presented by respondent's experts, as well as their analyses, to be helpful and persuasive. Petitioner has presented no quantitative evidence as to what its assertions of "substantial" appreciation mean in this case. Respondent has conceded a generous allowance of 15 percent for the appreciation that potentially occurred between January and November of 1986, and we will allow that amount. Therefore, the fair market value, as of January 1, 1986, of all of the works of art from the Scull collection (including Ethel Scull's pieces) sold at auction is $ 11,683,626 ($ 4,797,100 (Ethel) + $ 8,639,070 (Scull) = $ 13,436,170 + 1.15). 2. Works of Art offered but Not Sold at Auction
Sixteen works of art were offered but did not sell at the auction. Respondent concedes that there is no issue as to the value of these works because both the notice of deficiency and respondent's experts determined that these works were worth $ 59,950, which is less than the amount claimed on the estate tax return. Therefore, we accept respondent's valuation of $ 59,950 for these works. 3. Works Listed on the 1985 Appraisal Not *273 Offered at Auction
There were 42 items included in the 1985 appraisal that were not offered or sold at auction. Petitioner reported those works on the Form 706 at a total value of $ 178,725. Respondent increased that value to $ 260,925 in the notice of deficiency. Upon further evaluation, respondent's expert Ivan Karp lowered the statutory notice valuation to $ 219,800. We found Karp to be a credible and persuasive witness and his analysis to be thorough and unbiased. Petitioner has not shown that Karp's figures should be further lowered. However, there are two works for which Karp has not sustained his valuations above those determined in the statutory notice: Artist/
Sotheby's
Stat.
Karp
Item No.
Art Work
Appraisal
Notice
Value
13
Komodre/
"No Resale
$ 100
$ 650
Untitled
Value"  18
Truxell/
"No Resale
50
125
Untitled
Value"  Therefore, we sustain Karp's fair market valuation of 40 works of art in the amount of $ 219,025 and the notice of deficiency's valuation of two works at $ 150, for a total of $ 219,175. 4. Works Not Included in the 1985 Appraisal and Not Offered at Auction
Works of art from the Scull collection that were not included *274 in the 1985 appraisal and not offered at auction fall into the following three subcategories: (1) works by John Tweddle, [17](2) remaining works included in petitioner's valuation on its Form 706, and (3) later-discovered works. Richard Bellamy valued 169 items and 293 rolled-up drawings in decedent's collection that were not included in the 1985 appraisal and that were not offered or sold at auction. He determined the fair market value of those items to be $ 168,795. [18]
In the statutory notice of deficiency, respondent determined the value to be $ 493,165, but now concedes that, due to mathematical error, that amount should have been reported as $ 492,155. Karp's revaluation totals $ 323,150. *275 a. Works by Tweddle
Bellamy performed the original appraisal of those works, of which 60 paintings and all 293 of the drawings were created by John Tweddle. Bellamy valued the Tweddle works at $ 27,185. Karp valued the works at $ 143,500. Bellamy was Tweddle's agent in the 1970s and, except for decedent, there was hardly any market for Tweddle's works. In 1984, four to six Tweddle works were put up for sale by Sotheby's, but none was sold. In addition, no works were sold at an exhibition of the artist's works by the Blum Helman Gallery around the same time. This Court found Bellamy to be credible and thinks that he has the greatest knowledge of Tweddle's works. We accept his valuation of those works. Bellamy, however, did not value item number 39, and we accept Karp's value of $ 200. Therefore, the value of the works by Tweddle on the date of decedent's death was $ 27,385 ($ 27,185 + $ 200). b. Remaining Works included in Petitioner's Form 706
Bellamy valued the remaining 109 works of art at $ 141,610 ($ 168,795 - $ 27,185) and Karp valued them at $ 179,650 ($ 323,150 $ 143,500). Again, this Court found Karp to be a helpful and credible witness and, except *276 as noted below, we adopt his valuations for the remaining pieces. The following items bear more detailed discussion: Item No. 49 - Robert Goodnough. The valuation of $ 500 in the statutory notice of deficiency is sustained because petitioner failed to show why it should be lowered to $ 300, and respondent failed to show why it should be raised to $ 900 (difference in Karp value $ 900 - $ 500 = $ 400). Item No. 62 - $ 100 Bill by Andy Warhol. Karp has convinced this Court that the work he viewed was an authentic Warhol worth $ 8,500. Karp represented Warhol for many years throughout Warhol's career and was exceedingly familiar with the quality and characteristics of Warhol's artistic work. Item No. 111 - Malcom Morley. At trial, Bellamy conceded that this item, unidentified on his appraisal, was properly identified by Karp as a work by Malcom Morley. Therefore, we accept Karp's valuation of this item. Item No. 127 - Unidentified. Karp valued this item at $ 6,000 as the work of Frank Stella. It is not clear that this piece was created by Frank Stella. Therefore, the value of $ 10 in the statutory notice of deficiency is sustained (difference $ *277 6,000 - $ 10 = $ 5,990). Items No. 106, 117, and 132 - Bellamy determined that these items had no value. Karp valued these items at $ 75, $ 150, and $ 250, respectively (total $ 475). Again, neither party has supported their valuations sufficiently to merit disregarding the statutory notice valuations of $ 25, $ 10, and $ 50, respectively (total $ 85; difference $ 475 - $ 85 = $ 390).
Therefore, after evaluating all of the valuations and analyses of the experts in this case, we conclude that the fair market values of these 109 items, as of January 1, 1986, totaled $ 172,870 (Karp value less adjustments: $ 179,650 - $ 400 - $ 5,990 $ 390 = $ 172,870). c. Later-Discovered Works
During his inspection of the unsold works of art stored in the warehouse, Karp discovered and valued eight pieces that were not listed on any of petitioner's appraisals. He determined that these works were valued at $ 65,000 as of January 1, 1986. These later-discovered works of art represent a new matter on which respondent bears the burden of proof. Respondent made sufficient showing that these works were indeed part of the Scull collection. We accept Karp's identification and valuation *278 of these eight additional works of art. Therefore, we sustain respondent's valuation of the eight works at $ 65,000. Thus, the total fair market value for all of the works of art not listed on the 1985 appraisal and not offered at auction, as of January 1, 1986, is $ 265,255 ($ 27,385 (Tweddle) + $ 172,870 (remaining reported on return) + $ 65,000 (later-discovered)). 5. Entire Scull Collection
The entire Scull collection had a fair market value of $ 12,228,006 on the date of decedent's death ($ 11,683,626 + $ 59,950 + $ 219,175 + $ 265,255). 6. Decedent's 65-percent Undivided Interest
Decedent had a 65-percent undivided interest in the collection. Petitioner argues that the value of that interest was less than 65 percent of the value of the entire collection. Pursuant to the trial court in the divorce proceeding, Ethel Scull had a 35-percent undivided interest in the collection and the right to an in-kind distribution. Scull had appealed the Appellate Division's determination of constructive trusts to the Court of Appeals (highest court) which affirmed the lower court in April of 1986. In addition, after the valuation date, on January 31, 1986, Ethel Scull had *279 appealed to the Appellate Division, seeking to increase her portion to 50 percent. That appeal was not disposed of until February of 1987. Under the willing buyer/willing seller standard, the willing buyer is assumed to have reasonable knowledge of material facts. Estate of Crossmore, T.C. Memo. 1988-494. Any purchaser of petitioner's interest in the collection as of January 1, 1986, would consider Ethel Scull's rights in the collection and Scull's pending appeal on the date of death. However, since Scull's appeal, if successful, would have increased his share, that appeal does not provide any basis for a reduction. Moreover, since Ethel Scull's appeal came later, it probably should not be taken into account. In any event, given the trial court's detailed explanation of its basis for its determination of the 65-35 split, we think that a purchaser would not require a reduction in excess of 5 percent for any uncertainties involved in acquiring decedent's 65-percent interest, despite one or both appeals. Therefore, we find that the fair market value of decedent's interest in the art collection on the date of death was $ 7,550,794 [19] ($ 12,228,006 *280 x 65% = $ 7,948,204 - $ 397,410 = $ 7,550,794). *281 II Addition to Tax under Section 6651(a)
Respondent has determined that petitioner is liable for an addition to tax under section 6651(a)(1) for failure to file timely its Federal estate tax return. The extended due date of the return was April 1, 1987. [20] Petitioner filed the estate tax return on July 6, 1987. Petitioner does not contest the fact that the return was untimely filed, but contends that there was reasonable cause for the delay in filing. The addition to tax under section 6651(a)(1) applies unless the taxpayer can show that the failure to file timely was due to "reasonable cause and not due to willful neglect". Sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 245 (1985); *282 Crocker v. Commissioner, 92 T.C. 899, 912 (1989). "Reasonable cause" is present if a taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the date prescribed by law. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.; United States v. Boyle, supra at 246; Estate of Paxton v. Commissioner, 86 T.C. 785, 819 (1986). "Willful neglect" is defined as a "conscious, intentional failure or reckless indifference". United States v. Boyle, supra at 245. Petitioner asserts that reasonable cause for the late filing exists in this case due to the ill health of Richard Joseph, the estate's tax return preparer, and the complexities involved in preparing estimates of the estate's potential liability in a number of lawsuits that were pending during the period after decedent's death. It is respondent's position that petitioner's failure to file the estate tax return in a timely manner was due to willful neglect. The Supreme Court has held that reliance on an agent to file a return, no matter how reasonable, will not, *283 as a matter of law, constitute reasonable cause for a late filing under section 6651(a)(1). United States v. Boyle, 469 U.S. at 246-247. Furthermore, Congress has placed the burden of prompt filing on the executor, not on some agent or employee of the executor. The duty is fixed and clear; Congress intended to place upon the taxpayer an obligation to ascertain the statutory deadline and then to meet that deadline, except in a very narrow range of situations. Engaging an attorney to assist in the probate proceedings is plainly an exercise of the "ordinary business care and prudence" prescribed by the regulations, * * * but that does not provide an answer to the question we face here. To say that it was "reasonable" for the executor to assume that the attorney would comply with the statute may resolve the matter as between them, but not with respect to the executor's obligations under the statute. Congress has charged the executor with an unambiguous, precisely defined duty to file the return within nine months; extensions are granted fairly routinely. That the attorney, as the executor's agent, was expected to attend to the matter does not *284 relieve the principal of his duty to comply with the statute. [Emphasis in original.]
United States v. Boyle, supra at 249-250. Petitioner asserts that a number of factors led to the late filing of the estate tax return. First, petitioner contends that petitioner's accountant, Richard Joseph, played an essential and irreplaceable role in the preparation of the return due to his special and exclusive knowledge of decedent's financial affairs. Joseph was unable to complete his work on the return until July of 1987 because he was suffering from polio-related health conditions. In addition, petitioner asserts that the complexity of the return and the ongoing litigation against petitioner hampered the timely filing of the estate tax return. We have found in certain limited cases that illness or incapacity may constitute reasonable cause if the taxpayer establishes that he himself was so ill that he was unable to file a return. See Williams v. Commissioner, 16 T.C. 893, 906 (1951). [21] Further, the taxpayer must show that he was incapacitated to the extent that he was unable to exercise ordinary business care *285 and prudence. Akins v. Commissioner, T.C. Memo. 1993-256; cf. United States v. Boyle, 469 U.S. at 248 n.6. However, the illness of an accountant or other agent is not reasonable cause for an executor's failure to timely file the return. Estate of Geraci v. Commissioner, 502 F.2d 1148, 1149 (6th Cir. 1974), affg. T.C. Memo. 1973-94. The facts were quite sympathetic in Geraci. The executrix was a housewife with little or no business experience. She relied entirely upon the estate's attorney to prepare and file the return. The attorney was incapacitated by illness at the time the return was due to be filed, and he was under the mistaken impression that the return was due 15 months from the date of the appointment of the executrix *286 rather than from the date of death. Nevertheless, this Court found that those factors did not constitute reasonable cause for the failure to file the estate tax return in a timely manner. The United States Court of Appeals for the Sixth Circuit affirmed. In this case, the executors themselves were not incapacitated and knew they had the duty to file the return in a timely manner. They were aware of Joseph's declining health far in advance of the due date of the return. They contend that they offered him assistance in the preparation of the return but that he refused. Ordinary business care and prudence required the executors to actively manage and accomplish the preparation and filing of the estate tax return in a timely manner. An agent's refusal to accept assistance, causing delays in the preparation and filing of the return, does not rise to the level of reasonable cause to excuse the executors' duty to timely file the return. Petitioner further argues that the calculations required for the return were time consuming and extremely complicated and therefore constitute reasonable cause for the delay. Case law in this area, however, indicates otherwise. In United States v. Kroll, 547 F.2d 393, 396 (7th Cir. 1977), *287 the Seventh Circuit Court of Appeals held that: when there is no question that a return must be filed, the taxpayer has a personal, nondelegable duty to file the tax return when due. * * *
We are not convinced that the executors could not have made reasonable estimates of the complicated items, to be amended later, in order to timely file the return. Petitioner also asserts that the excessive and complex litigations in which it was embroiled during this period prevented the timely filing of the estate tax return. Pending litigation, even if the outcome affects the estate's final tax liability, is not reasonable cause for failing to timely file an estate tax return. Estate of Mayer v. Commissioner, 351 F.2d 617 (2d Cir. 1965), affg. 43 T.C. 403 (1964); Estate of Duttenhofer v. Commissioner, 49 T.C. 200 (1967), affd. per curiam 410 F.2d 302 (6th Cir. 1969); Estate of Pridmore v. Commissioner, T.C. Memo. 1961-12; Sever v. Commissioner, T.C. Memo. 1954-63. In fact, we have held that pending litigation *288 affecting the fair market value of a decedent's interest in property held at her death was not reasonable cause for untimely filing. Porter v. Commissioner, 49 T.C. 207, 226-227 (1967). In Porter, we held that the executor should have filed a timely estate tax return by giving only tentative values pending the outcome of the litigation. In such situations, reasonable estimates are permitted and are preferable to the failure to file the estate tax return within the prescribed time. Id.
The executors in this case, Epstein and Marie Dickson, are experienced professionals. Epstein is an experienced attorney and long-time associate of the Sculls. Marie Dickson is an experienced businesswoman who, from 1954 until decedent's death, managed all of the administrative duties of decedent's taxicab business and his art gallery. Both executors were fully aware of the due date of the estate tax return. As an attorney, Epstein was aware that an incomplete return could be filed by the estate and amended later. Thus, as the deadline for filing the estate tax return drew closer, ordinary business care and prudence required that the executors utilize *289 whatever information had been gathered and prepared to that point to file a timely return and to continue finalizing information for an amended return at a later date. We agree with respondent that the executors were willfully negligent in their failure to take these steps. Therefore, we sustain respondent's determination that petitioner is liable for an addition to tax under section 6651(a)(1). III Increase in Taxable Gifts
Respondent asserts that petitioner's taxable gifts must be increased by $ 5,000 because decedent wrote two checks to one of his sons in the amounts of $ 10,000 and $ 5,000 during 1985. Petitioner has failed to present any evidence on this issue, and therefore, respondent's determination will be sustained. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). IV Conclusion
This Court holds that the fair market value of decedent's 65-percent undivided interest in the Scull art collection on January 1, 1986, was $ 7,550,794. We also hold that the taxable gifts are increased by $ 5,000 and that petitioner is liable for an addition to tax for the late filing of the estate tax return under section 6651(a)(1). Based upon *290 the foregoing, Decision will be entered under Rule 155. Footnotes
1. The parties have stipulated to the following adjustments to the estate tax return: a $ 103,402 adjustment to items 4(c) and 4(e) of Schedule F; administration expenses have been increased from $ 225,000, as reported in item B-2 of Schedule J, to $ 563,550; debts of the decedent in items 27 and 28 of Schedule K claimed in the total amount of $ 1,150,000 were reduced to $ 60,000; debts of the decedent in item 29 of Schedule K claimed in the amount of $ 221,642 were reduced to $ 25,000; and debts of the decedent in item 38 of Schedule K claimed in the amount of $ 100,000 were reduced to zero. The parties have also agreed to the following adjustments to Schedule B: ↩
Per Return
Determined
Adjustment
Item 3
$ 40,000
$ 43,600
$ 3,600
Item 4
10,000
9,700
(300)
Item 7
268,181
179,334
(88,847)
Total Adjustment:
($ 85,547)
2. Thomas Epstein is also petitioner's counsel in this case. Marie Dickson is an experienced businesswoman who, from 1954 until decedent's death, managed all of the administrative duties of decedent's taxicab business and his art gallery.↩
3. The nine works of art that Ethel Scull received brought hammer prices totaling $ 4,361,000. The buyers paid a buyer's commission of 10 percent on the hammer price, totaling $ 436,100. Ethel Scull also paid seller's commissions of 2 percent of the hammer prices totaling $ 87,220.↩
4. Two works, Jo Baer's Untitled, 1963 and Young's #9, 1972, were not assigned lot numbers and apparently were not offered for sale.↩
5. On Schedule F of the estate tax return, the estate reported the following values of the collection: Works of Art (undivided)
Original Appraisal - median value  Prepared by Sotheby - Parke Bernet Inc.  $ 6,799,375 Additional paintings in warehouse not listed
in original inventory  208,335 Less: 35% due Ethel Scull  (72,917)
$ 135,418  Paintings sold - not listed in original
Sotheby's inventory  87,100 Less: 35% due Ethel Scull  (30,485)
$ 56,615   Total:
$ 6,991,408 On Schedule K of the estate tax return, the estate deducted $ 2,352,997 for Ethel Scull's share of the works of art listed on the 1985 appraisal. [($ 6,799,375 - $ 2,352,997) + ($ 208,335 $ 72,917) + ($ 87,100 - $ 30,485) = $ 4,638,411]↩
6. The "Court" refers to the trial court in the Sculls' divorce action.↩
7. Petitioner did not choose to value the property in question on an alternate valuation date. See sec. 2032(a).↩
8. Bellamy also attached a copy of his curriculum vitae, a copy of his report that was attached to the estate tax return (Form 706), and a copy of the so-called Wolf letter (see infra↩ note 10).
9. Despite this Court's repeated explanations of the Tax Court Rules pertaining to expert witness reports, petitioner did not seem to understand that an expert report, to be submitted to the Court and the opposing party not later than 30 days prior to trial, constitutes that expert's direct testimony in the case. Rule 143(f). The expert is to prepare a report setting forth in detail his qualifications as an expert, his opinion, and the facts and data on which that opinion is based. An expert witness' report can be excluded altogether for failure to comply with Rule 143(f). However, it is within this Court's discretion to allow additional direct testimony with respect to a report, and we exercised that discretion in petitioner's favor in this case.↩
*. Figure on estate tax return was $ 208,335.↩
10. Wolf refused to appear as an expert witness at the trial. This Wolf letter was not received into evidence because it was an improper attempt to use materials of someone who was not available to testify before the Court. It was not established that Castelli or Bellamy had firsthand knowledge of the statements in the Wolf letter.↩
11. Bellamy had also supported that figure.↩
12. The use of the word "sale" in reference to the Brant Agreement is not intended to mean that we have determined that this agreement represents a bona fide sale. Although there are many factors indicating that the benefits and burdens of ownership did not pass to Brant, as will be discussed in the text below, we need not reach that issue.↩
13. This total is the sum of $ 5,300,000 plus $ 1,013,081 (one-half the net auction proceeds in excess of $ 5,300,000) and $ 785,370 (buyer's commissions).↩
14. Respondent draws a distinction between income taxation under sec. 1001 and the tax imposed on transfers of a taxable estate under sec. 2001. For income tax purposes, the gain on sales of property cannot exceed the "amount realized", which is defined as "the sum of any money received plus the fair market value of the property (other than money) received." Sec. 1001(b). Respondent asserts that this concept of realization is not applicable to the tax imposed upon transfers of a taxable estate under sec. 2001 because the estate tax is based upon the value of the property transferred, not upon the gain from a particular transaction. We agree. See also Gillespie v. United States,     F.3d    ↩ (2d Cir. 1994).
15. Petitioner takes exception to respondent's application of an average rate of appreciation on decedent's interest in the collection. Petitioner asserts that a separate rate of appreciation (or depreciation) should be determined for each individual artist or work of art. We do not agree in this case. The evidence shows that Jasper Johns and James Rosenquist, whose six works constitute 63 percent of the auction results achieved, were experiencing stagnation or declines in the value of their works during the relevant period. Respondent thus asserts that not only is an average rate more beneficial to petitioner but that it is in keeping with the characterization of the works of art as a "collection" with its enhanced marketability as such. We agree that the use of an average rate of appreciation is appropriate in this case.↩
16. Estate of Bennett v. Commissioner, T.C. Memo. 1993-34; Estate of Rodriguez v. Commissioner, T.C. Memo. 1989-13↩.
17. We reiterate that these works only include Tweddle works not included on the 1985 appraisal. There were Tweddle works in the Sotheby's appraisal upon which Bellamy and Karp agree as to the fair market value.↩
18. The values provided by petitioner totaled $ 196,185; however, petitioner did not provide values for items no. 39, 123, and 145. Bellamy's appraisal stated a total value of $ 208,355; therefore, respondent assumed that the difference related to those unvalued items. In addition, certain items were included in Bellamy's appraisal that had already been valued in the Sotheby's report. Thus, respondent contends that, when the values of those items ($ 39,600) are subtracted from the total, the result is $ 168,795. Bellamy states that, when duplications and mathematical errors are corrected, the correct figure is $ 151,055. We have been unable to resolve these discrepancies.↩
19. The Court has satisfied itself as to the reasonableness of the $ 7,550,794 valuation figure by comparing it to the result of another approach. Using only the hammer prices of only the estate's auction sales ($ 7,853,700), discounted by 15 percent for appreciation between January 1, 1986 and November 11-12, 1986, amounts to $ 6,829,304 for the auction sales items. The $ 6,829,304 for the auction sales items plus decedent's 65-percent interest in the other categories of the art collection ($ 353,847) gives a total of $ 7,183,151 for decedent's total interest in the art collection. Reducing the figure of $ 7,183,151 by a generous 5 percent for any litigation uncertainties ($ 359,158) results in a total figure of $ 6,823,993. This is about 10 percent less than the $ 7,550,794 we have found as the fair market value of decedent's 65-percent undivided interest in the art collection. The difference is somewhat less than the buyer's commissions of $ 785,370. However, we think the buyer's commission is clearly part of the auction sales price for the art collection. Possibly no discount is warranted for the 10-1/2 month period between the date of death and the auction sale, but we have allowed 15 percent. We have serious doubt that any reduction is warranted for litigation uncertainties in this case, but we have allowed 5 percent. Moreover, under both approaches, the Court has not included the $ 150,000 that Sotheby's paid the estate for Sotheby's guaranty for Two Flags. Valuation not being an exact science and the various experts having come up with different approaches and various figures, we are satisfied that our finding of a fair market value of $ 7,550,794 is reasonable and amply supported by the record in this case.↩
20. Federal estate tax returns are due to be filed within 9 months after the date of the decedent's death. Sec. 6075(a). The time for filing the estate tax return may be extended, but for not more than 6 months and for not more than a total of 15 months after the date of the decedent's death. Sec. 6081(a); sec. 20.6081-1(a), Estate Tax Regs.↩
21. See also Akins v. Commissioner, T.C. Memo. 1993-256; Fambrough v. Commissioner, T.C. Memo. 1990-104↩.