ESTATE OF DOMINICK A. NECASTRO, DECEASED, CHARLOTTE A. BURAK, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Necastro v. Commissioner
Docket No. 25301-91
United States Tax Court
T.C. Memo 1994-352; 1994 Tax Ct. Memo LEXIS 352; 68 T.C.M. (CCH) 227; July 26, 1994, Filed *352 Decision will be entered under Rule 155. For petitioner: Robert E. Schlusser and Bryan Edward Keenan. For respondent: Helen F. Rogers. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $ 61,573 in petitioner's Federal estate tax. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issue for decision in this case is the value of property owned by Dominick A. Necastro (decedent) at his death on October 25, 1985. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time of the filing of the petition in this case, Charlotte A. Burak (Burak), executrix of the estate of decedent, resided in Wilmington, Delaware. Decedent was a resident of New Castle County, Delaware, before his death. Decedent's will was duly admitted to probate by the Register of Wills of New Castle County, Delaware, who issued Letters Testamentary to Burak, authorizing her to act as executrix *353 of decedent's estate. At the time of his death, decedent, directly and through a "straw party", owned land along Old Airport Road in New Castle, Delaware. Decedent also owned all of the issued and outstanding stock of Apartment and Home Builders, Inc., a Delaware corporation (the corporation). The corporation owned land along Old Airport Road that adjoined the land that was owned by decedent and the straw party. The land owned by the corporation and through the straw party will hereinafter be referred to as "effectively owned" by decedent. These properties were collectively known as 477-495 Old Airport Road, New Castle, Delaware (the New Castle property). The other assets of the corporation were worth $ 1,563 on decedent's date of death. Prior to and at the time of decedent's death, the New Castle property was used as an automobile salvage yard (the salvage yard). The salvage yard consisted of an irregularly shaped parcel of land of between 26 and 27 acres that extended from the west side of Old Airport Road to the eastern band of the Christiana River. Ten underground storage tanks existed on the site. Between 1 and 2 acres of the property were improved; the remaining 25 *354 to 26 acres were used for the open storage of junked cars. For at least 2 years prior to decedent's death, 25 to 30 dump truck loads of fill were dumped on the tract each day. Because other dumps had been closed, the persons dumping fill on the salvage yard paid decedent approximately $ 50 to $ 100 a load, depending on the size of the truck. The Delaware Department of Natural Resources and Environmental Control (DNREC) had the authority either to require the removal of, or to require the development of a monitoring program for, regulated solid waste disposed of in an unauthorized dump site after 1976. DNREC had been monitoring the New Castle property on a regular basis since the early 1980s and found no problems before decedent's death. New Castle County's computerized tax assessment system listed the New Castle property tax assessments at $ 518,900 as of July 1, 1983. A search of the New Castle County records revealed no record of an appeal of the property tax assessments for the New Castle property as of January 20, 1994. After decedent's death, Vincent A. Necastro, Jr. (Vincent Necastro), ran the business and continued to fill the New Castle property. In 1986, DNREC cited *355 Vincent Necastro for placing illegal fill on the property. The objectionable material was removed, and grading and filling continued. On August 19, 1988, Burak filed a United States Estate Tax Return, Form 706, for decedent's estate. The New Castle property was reported on the estate tax return as having a value of $ 735,000 at the date of death. This consisted of $ 435,000 for the portion of the salvage yard that was directly owned by decedent and $ 350,000 for the portions that were effectively owned by decedent. Adjacent to the salvage yard on its northeastern border was a site owned by DuPont Company (DuPont) that was under investigation in 1990 by the Federal Environmental Protection Agency (EPA) as a possible "superfund" site. The DuPont site was a potential source of contamination by metals, particularly cadmium, barium, and zinc, of groundwater on the New Castle property. However, the concentrations of the total metals found in groundwater samples that were taken in 1990 did not indicate a significant environmental concern for the site. A Phase I Preliminary Environmental Assessment of the New Castle property, dated May 1990 (the Duffield report), was prepared *356 by Duffield Associates, Inc. (Duffield). Duffield also prepared two letters dated March 6, 1992, and May 25, 1993, that supplemented the report. A Phase II Audit Report of the New Castle property, dated November 30, 1990 (the WIK report), was performed by WIK Associates, Inc., an environmental analysis firm (WIK). Fourteen test pits were excavated for the WIK analysis. The WIK report identified four types of environmental contamination on the property that could potentially affect the value of the property: (1) Limited soil contamination from oil and grease released on the site from junked automobiles (near test pits 7 and 13); (2) limited groundwater and soil contamination due to a probable leaking underground storage tank (near test pit 10); (3) limited groundwater contamination due to metals contamination, possibly caused by contamination on an adjacent site (near test pits 2 and 8); and (4) "regulated solid waste" (in eight of the test pits). Regulated solid waste, as defined by DNREC, included garbage, refuse, and rubbish. Rubbish was defined as cardboard, paper, plastic, metal or glass food containers, rags, waste metal, yard clippings, small pieces of wood, excelsior, *357 rubber, leather, crockery, and other waste material. The New Castle property had been approved for "clean fill", consisting of concrete, stone, blacktop asphalt, and soil. The materials found in the test pits included wood scraps, carpet, tires, plumbing debris, metal strapping, clothing and rags, steel rebar, plastics, rope, electrical cable, household trash, and automobile brake drums, gasoline tanks, and trim. Both the WIK and the Duffield reports included cost estimates for the remediation of the contamination on the property; neither included groundwater remediation in their calculation of estimated cost. On August 15, 1990, petitioner filed a Claim for Refund, Form 843, with the Internal Revenue Service. Petitioner claims that decedent's property on Old Airport Road and decedent's stock in the corporation were together worth no more than $ 1,563 on the date of decedent's death due to environmental cleanup expenses that had not been taken into account earlier in valuing the New Castle property. In the notice of deficiency, respondent determined that the value of the property on Old Airport Road that was directly owned by decedent was $ 485,000 and that the value of *358 the land that was effectively owned by decedent was $ 390,000. OPINION Section 2031(a) provides: The value of the gross estate of the decedent shall be determined by including * * * the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.
Section 20.2031-1(b), Estate Tax Regs., expands on the valuation of property in the gross estate: The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death * * * The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. * * * All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. * * *
The New Castle property was reported on the estate tax return as worth $ 785,000 on the valuation date. The value stated on the return is an admission by petitioner. A lower value cannot be substituted without cogent proof that the reported value *359 was erroneous. See Estate of Hall v. Commissioner, 92 T.C., 312, 337-338 (1989); Estate of Mooneyham v. Commissioner, T.C. Memo. 1991-178. Here, petitioner contends that, because of environmental contamination on the property, the property was overvalued on the estate tax return. Respondent agrees that a lower value than that reported on the estate tax return (or determined in the deficiency notice) is appropriate as a result of environmental contamination. The parties do not dispute that the value of the New Castle property as of October 25, 1985, without regard to any contamination, was $ 850,000. The parties diverge, however, as to the appropriate discount to be applied to the value of the property. Respondent contends that the property was worth $ 562,000 as of October 25, 1985. Petitioner asserts that the property was worth between negative $ 50,000 and negative $ 375,000 at that time. Each party presented expert testimony regarding the value of the New Castle property as of decedent's date of death. The parties' experts both based their evaluations on the Duffield report and the WIK report. The experts agree *360 on a number of items, including the following: (1) There was a need to clean up soil contamination emanating from the oil and grease from automobiles stored on or under the site; (2) there was a need to remove the 10 underground storage tanks and to treat the contaminated soil near test pit 10; (3) there was a need for a hydrogeological investigation; and (4) the groundwater contamination due to metals contamination near test pit 8 would be handled by DuPont. The experts do not agree to what extent any solid waste contamination was present on the property in 1985, whether a buyer in 1985 would have considered solid waste to have been a potential problem requiring a reduction in the value of the property, or whether public perception would reduce the value of the property if it were cleaned up and free of contaminants. We are not bound by the opinion of any expert, and we may accept an expert's opinion or reject testimony that is contrary to our judgment. Estate of Hall v. Commissioner, 92 T.C. at 338. Respondent's expert, Diane R. Maiden (Maiden), determined the cost to treat the environmental conditions that would have been perceived as affecting *361 the property value in October 1985 to be $ 288,000, which included: $ 58,000 to remedy the soil contamination near test pits 7, 10, and 13; $ 200,000 to remove 10 storage tanks; and $ 30,000 for hydrogeological investigation. Maiden based her cost estimates on estimates provided by Duffield in the letter dated March 25, 1993. In the opinion of petitioner's expert witness, John J. Coyle 3rd (Coyle), the existence of environmental contamination on the property reduced its value in two respects: First, by the actual costs of remediation and, second, by a perceived diminution in value of the property as a result of previous contamination even if such contamination were to be remedied. In Coyle's opinion, the remediation process would take 2 years to complete, at which time the value of the property (in a remedied state) would have increased to $ 901,000. He calculated the present value of $ 901,000 on the date of death to be $ 735,000 and used this as the starting point for his evaluation. According to Coyle, the cost of professional audits and investigations to identify the nature of the contamination and the scope of necessary remediation would range from $ 50,000 to $ 100,000, *362 the direct costs of remediation and post clean up monitoring and testing for the potential problems raised by the WIK report would range from $ 635,000 to $ 860,000, and a finding of contamination would impair the marketability of the property resulting in a reduction in value of $ 100,000 to $ 150,000. Thus, Coyle determined that the date of death value, taking into account the costs of remediation and diminution in value to the property, was between negative $ 50,000 and negative $ 375,000. Petitioner claims, based on Coyle's report, that, in 1985, a buyer would have deemed the property worthless and would not have purchased the property. Petitioner argues that, under United States v. Simmons, 346 F.2d 213 (5th Cir. 1965), the issue here is whether, in light of all the circumstances, a reasonable investigation of the New Castle property in 1985 would have revealed the presence of buried solid waste to a potential buyer. The question in the Simmons case was the value of a claim for a tax refund at the time of Simmons' death. The taxpayer argued that the claim had no value at that time because it was not discovered until later. The court there *363 held that a reasonable knowledge of the relevant facts at the time of Simmons' death would have revealed the basis for a valuable refund claim. Id. at 217. The court further held that "ignorance of the value of an asset at the time of a decedent's death does not justify treating the asset as valueless". Id. at 218. Here, it is not clear what the relevant facts were at the time of decedent's death with respect to environmental contamination or what effect, if any, such contamination would have had on the value of the property. In our view, the question is whether, on October 25, 1985, a reasonable buyer would have discovered solid waste on the property and, if solid waste were discovered, whether a buyer would have discounted the value of the property because of it. See Estate of Pillsbury v. Commissioner, T.C. Memo. 1992-425, which involved the valuation of real property on which environmental contamination had been found 3 or 4 years after the valuation date. We there held that, because the taxpayer had not believed further investigation was necessary before stating a value for the *364 property, there was no reason to believe that a hypothetical buyer would have done more investigation. Respondent contends that a portion of the solid waste contamination reported in the environmental reports may have occurred subsequent to the date of decedent's death. The environmental reports were both dated in 1990, well after the valuation date. Vincent Necastro operated the automobile salvage business after decedent's death, and he continued to allow fill to be placed on the land. Thus, petitioner has not shown that the level of solid waste on the property in 1985 was the same as that discovered in 1990. We would therefore be unable to determine the remediation cost of solid waste present in 1985. Respondent also argues that environmental oversight was more stringent in 1990, when the audits were performed, than it had been at the valuation date and that, even as of 1990, both of the environmental reports stated that the solid waste would only have to be removed if the State changed its position on the site. Respondent further points to the consistent monitoring of the property by DNREC with no problem found until 1986, when Vincent Necastro was running the business, *365 after decedent's death. That problem was remedied, and no further action was taken with respect to the property. Respondent argues that a willing buyer and seller would not have agreed to reduce the price of the property based on the possibility that Delaware might, at some future time, change its position on the property. Thus, respondent maintains that, even if solid waste were discovered on the property, petitioner has not proven that, as of 1985, a buyer would have perceived the solid waste as a problem. Petitioner maintains that the lack of action by DNREC previous to October 1985 did not foreclose it from taking action at some later time. Petitioner, however, has not demonstrated the likelihood of DNREC action as of October 1985 or that a buyer would have discounted the property on the basis of the possibility of future action by DNREC. Petitioner also refers to testimony of Vincent Necastro that DNREC employees on the site appeared to be friends with decedent. Petitioner seems to imply that this was the reason no action was taken with respect to the solid waste before decedent's death. Petitioner presented no substantiation of this allegation, and we are not persuaded *366 that it is entitled to any weight. Petitioner further argues that, because the Comprehensive Environmental Response, Compensation and Liability Act of 1980, Pub. L. 96-510, 94 Stat. 2767, 42 U.S.C. secs. 9601-9675 (1988) (CERCLA), had been in existence for 5 years before decedent's death and because the "superfund" portion of CERCLA was established, among other reasons, to handle emergencies and to clean up "solid waste sites", there was a basis for assuming that the market would have considered solid waste as a potential problem on the date of decedent's death. Petitioner's speculation is a far cry from "cogent proof" that would overcome its admission on the estate tax return and is insufficient to satisfy petitioner's burden of proof. In any event, Maiden testified persuasively that the market would not have considered solid waste disposal a problem with respect to the New Castle property in October 1985. There is no indication in the record that any major solid waste problem has ever been identified on the property by the EPA or by DNREC. Three basic flaws in petitioner's arguments are fatal to petitioner's position. First, environmental *367 audits were not performed until 1990, 5 years after the valuation date. Therefore, we cannot determine whether the contamination occurred before or after the valuation date. Second, there was ongoing use of the property after decedent's death, including addition of fill, and no major environmental problems were reported as of the time of trial in 1994. Finally, petitioner has not proven that a buyer in 1985 would have perceived the solid waste as an environmental problem that would have caused a reduction in the value of the New Castle property due to remediation costs or the property's diminished value due to decreased marketability. On consideration of the entire record, we allow petitioner the reduction in value of $ 288,000, as set forth by respondent's expert as the estimated cost to clean the soil contamination, to remove the underground storage tanks, and for hydrogeological investigation. Accordingly, we hold that the value of the property was $ 562,000 ($ 850,000 minus $ 288,000) as of October 25, 1985. Decision will be entered under Rule 155.