ANDRESINI, J.T.C.
This is the court’s opinion in connection with the parties’ respective motions for summary judgment in the above-referenced matter. Plaintiff, the Estate of Theodore Warshaw (“the Estate” or “Plaintiff’), and the defendant, Director, Division of Taxation (“the Director”), filed cross-motions for summary judgment with regard to the Director’s denial of a $88,677 refund claim made by the Estate.
Plaintiff was a victim of the Bernard L. Madoff (“Madoff’) Ponzi scheme.[1] Plaintiff asserts that Plaintiffs estate tax return overstated the true value of the net estate because the value it reported on the return was based on the purported value of the Estate’s individual retirement account (“IRA”) provided in the account statement. Plaintiff seeks summary judgment ordering the Director to issue a refund for the total amount of estate tax paid by the Estate.
*361 The Director contends that the Estate’s refund claim was properly denied because Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), is controlling, and therefore, subsequent events cannot be considered to determine date of death value of an estate for New Jersey estate tax purposes.
For the reasons set forth below, the Estate’s motion for summary judgment is granted, and the Director’s cross-motion is denied.
I. Findings of Fad, and Procedural History
Theodore Warshaw (“the Decedent”) died testate on May 27, 2006. On July 27, 2006, Lawrence Warshaw and Jay Gaines (“the Co-Executors”) were named executors and issued letters testamentary. On or about February 27, 2007, the Estate, by its Co-Executors made an estimated New Jersey Resident Decedent Estate Tax payment of $90,000. Along with the estimated payment, the Co-Executors filed a New Jersey Form IT-EP “State of New Jersey, Division of Taxation—Inheritance and Estate Tax, Payment on Account (Estimated Payment)” and a Form IT-EXT “NJ Division of Taxation—Inheritance and Estate Tax, Application for Extension of Time to File a Return.”
Subsequent to making the estimated tax payment, the Estate filed New Jersey Form IT-Estate, “Resident Decedent Estate Tax Return,” with the New Jersey Division of Taxation on or about July 30, 2007. On the Form IT-Estate, the Co-Executors reported the date of death value of the Net Estate as $1,848,293. The Estate’s return reported $88,677 in estate tax, with a claim for refund in the amount of $1,323. At the request of the Division, the Estate provided additional documentation to support the amount reported for assets in the Net Estate. Decedent’s taxable estate included an IRA that decedent owned at the time of his death. When the Co-Executors filed the Form IT-Estate, they believed the IRA was funded with investment securities managed by Bernard L. Madoff Securities, LLC (“BLMIS”) and had value. FISERV, Inc. (“FISERV”), a company that served as custodian *362 for IRAs managed by BLMIS, provided an account statement[2] to the Estate, reporting a date of death value of $1,463,733. On April 18, 2008, the Division issued a Notice of Assessment for Overpayment of estate tax and refunded $1,323 to the Estate.
Decedent entrusted funds with Madoff to invest in securities which were supposed to be set aside in an IRA. As discussed below, the account did not contain any securities, cash, bonds, or other financial instruments. Indeed, any payments that Madoff made to the Decedent or his wife were made with money that came from other Madoff investors and not from funds in the IRA. The account statements provided by FISERV to both the Decedent and the Estate were fictitious.
As per Decedent’s last will and testament, the IRA was transferred to a trust for the benefit of the Decedent’s wife. The IRA beneficiary request form indicates the named beneficiary of the IRA was the Trust under Paragraph Four of Decedent’s last will and testament.[3] This was a Trust for the Benefit of the Spouse for Life, with Barbara Warshaw as the named beneficiary. The form further indicates that payments were to begin September 15, 2006. In the 2007 tax year, Decedent’s wife received $183,148.35 in total distributions. In the 2008 tax year, she received $90,477.99 in total distributions.[4]
Madoff was arrested in December 2008 for running a Ponzi scheme. The United States Attorney’s Office for the Southern District of New York filed federal charges against Madoff, inelud- *363 ing charges for securities fraud, money laundering, theft, and embezzlement. On March 12, 2009, Madoff pled guilty to eleven federal charges in Federal District Court. In his plea allocution, Madoff admitted to defrauding investors by using the advisory side of BLMIS to operate a Ponzi scheme. Madoff also admitted that he misrepresented to clients and potential clients what he would do with their money once they provided it to BLMIS. He told them that he would invest their money in stocks, bonds, or other financial instruments. However, Madoff never invested his clients’ funds in securities, but instead deposited the funds into a JP Morgan Chase bank account used to satisfy withdrawal demands from other clients.[5] FISERV generated and provided statements to Plaintiff and other clients that contained sham security transactions and account balances.[6] On June 29, 2009, the District Court sentenced Madoff to 150 years in prison. (Trustee’s First Interim Report for the Period December 11, 2008 Through June 30, 2009, Securities Investor Protection Corporation v. Bernard, L. Madoff Investment Securities LLC, (Bankr. S.D.N.Y.)Adv.Pro.No. 08-1789).
On January 12, 2009, Plaintiff submitted a claim for refund to the New Jersey Division of Taxation for the full amount of estate tax paid, $88,677. In a letter attached to the claim, Plaintiff contended that the Division should grant the refund because the taxable estate falls under the $675,000[7] filing threshold. Speeifi- *364 cally, plaintiff asserted that the IRA, previously valued at $1,463,733, is and was always worthless, and therefore was improperly valued on the Estate’s tax return.
By a letter dated February 6, 2009, the Director denied Plaintiff’s request for refund, stating that Plaintiff “had not substantiated that subsequent events have altered the value of the asset.” Plaintiff appealed the Director’s denial by filing a complaint with the Tax Court of New Jersey on or about April 15, 2009. Both parties filed motions for summary judgment. On the return date of the motion, the court heard oral argument for the parties’ motions for summary judgment.
II. Conclusions of Law
The court must view the Plaintiffs case with consideration of the presumptive validity of the Director’s determinations. See Campo Jersey, Inc. v. Director, Division of Taxation, 390 N.J.Super. 366, 383, 915 A.2d 600 (App.Div.), certif. denied, 190 N.J. 395, 921 A.2d 448 (2007). “New Jersey courts generally defer to the interpretation that an agency gives to a statute that agency is charged with enforcing.” Koch v. Director, Division of Taxation, 157 N.J. 1, 15, 722 A.2d 918 (1999); See also, Estate of Claire Schnestuhl v. Director, 2012 N.J.Tax LEXIS 2. This court recognizes the Director’s “expertise in the highly specialized and technical area of taxation.” Aetna Burglar & Fire Alarm Co. v. Director, Division of Taxation, 16 N.J.Tax 584, 589 (Tax 1997). Therefore, the Director’s denial of the Estate’s refund claim is accorded with a presumption of correctness, and the Plaintiff bears bear the burden of overcoming the presumption of validity. See Meadowlands Basketball Assoc. v. Director, 19 N.J.Tax 85 (Tax 2000), aff'd., 340 N.J.Super 76, 773 A.2d 1160 (App.Div.2001); *365 T.A.S. Lakewood, Inc. v. Director, Division of Taxation, 19 N.J.Tax 131, 140 (Tax 2000). “However, this deference is ‘not total, as the courts remain the ‘final authorities’ on the issues of statutory construction and are not obliged to ‘stamp’ their approval of the administrative interpretation.’ ” Koch, supra, 157 N.J. at 15, 722 A.2d 918 (citing New Jersey Guild of Hearing Aid, Dispensers v. Long, 75 N.J. 544, 575, 384 A.2d 795 (1978)).
Plaintiff primarily contends that it is entitled to summary judgment as a matter of law because there are no material facts in dispute that support the Director’s denial of Plaintiffs claim for refund. In support of its motion, Plaintiff asserts that the value of the Estate reflected on its tax return is inaccurate because it was based upon a fraudulent summary account statement produced by a third party intermediary of the Madoff Ponzi scheme. The Director’s cross-motion is grounded in the notion that the discovery of Madoffs Ponzi scheme after the decedent’s death is irrelevant to the valuation of the estate for New Jersey estate tax purposes because subsequent events cannot be considered to value the Net Estate. The Defendant contends that it is entitled to summary judgment because there are no material facts in dispute as to the Director’s proper denied of the refund. For the reasons stated more fully below, Plaintiffs motion is granted and Defendant’s motion is denied.
A. Summary Judgment Standards
When presented with a motion for summary judgment, the standard which guides this court is that summary judgment shall be granted if “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.” R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29, 666 A.2d 146 (1995). There is a genuine issue of material fact “only if, considering the burden of persuasion at trial, the evidence submitted by the parties, on the motion, together with all legitimate inferences therefrom *366 favoring the non-moving party, would require submission of the issue to the trier of fact.” R. 4:46-2(c).
To determine whether there is a genuine issue of material fact, the court must ascertain what rational conclusions a reasonable jury could derive from the evidence. Brill, 142 N.J. at 535, 666 A.2d 146. In making this determination, the judge “must accept as true all evidence which supports the position of the party defending against the motion and accord him ... the benefit of all legitimate inferences which can be deduced therefrom [.]” Ibid. (quoting Pressler, Current N.J. Court Rules, comment 1 on R. 4:40-2 (2007)). Thus, if reasonable minds could differ, then the court must deny summary judgment. Ibid.
Nonetheless, in Brill v. Guardian Life Ins. Co. of America, the Supreme Court opined that “a court should deny a summary judgment motion only where the party opposing the motion has come forward with evidence that creates a ‘genuine issue as to any material fact challenged.’ ” 142 N.J. 520, 529, 666 A.2d 146 (1995) (quoting R. 4:46-2(c)). Accordingly, “when the evidence is so one-sided that one party must prevail as a matter of law the trial court should not hesitate to grant summary judgment.” Id. at 540, 666 A.2d 146 (citations omitted).
The “essence of the inquiry” is “whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.” Id. at 536, 666 A.2d 146 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must consider whether the evidence provided is sufficient to allow a reasonable factfinder to find in favor of the non-moving party. Id. at 540, 666 A.2d 146. Moreover, the court shall view the facts in the complaint and all reasonable inferences drawn therefrom “in the light most favorable to the non-moving party.” Id. at 523, 666 A.2d 146.
To defeat a motion for summary judgment, the non-moving party carries the burden “to make an affirmative demonstration, where the means are at hand to do so, that the facts are not as the movant alleges.” Spiotta v. William H. Wilson, Inc., 72 N.J.Su *367 per. 572, 581, 179 A.2d 49 (App.Div.), certif. denied, 37 N.J. 229, 181 A.2d 12 (1962). Accordingly, the non-moving party must provide more than a “mere scintilla” of evidence in support of its position; it must present facts which are substantial or material in nature from which a reasonable factfinder could find for them. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75, 110 A.2d 24 (1954).
The issue here is whether the Director properly denied Plaintiffs claim for refund. In the instant matter, there are no material facts in dispute. Therefore, I find this matter is ripe for summary judgment.
In support of its motion, Plaintiff contends that the date of death value of the IRA was $0 because the IRA administered by FISERV and maintained with Madoff Securities did not own any assets, such as cash or other securities at the time of Decedent’s death. Therefore, Plaintiff asserts that the Net Estate was overvalued by $1,463,773, which reduces the Decedent’s actual Net Estate to $384,520. As $384,520 is well below New Jersey’s $675,000 taxable threshold, no estate tax is owed. Alternatively, Plaintiff argues that the value of the IRA is not greater than $273,626.34, which is the sum of the total distributions received by decedent’s wife. Plaintiff further asserts that even if the value of the IRA is $273,626.34, the Estate is entitled to a refund because the Net Estate would total $658,146.34, which is less than $675,000. Accordingly, Plaintiff argues that the court should grant its motion for summary judgment.
The Director contends that the date of death value of the IRA as indicated by the supporting documents attached with the IT-R was properly stated. The Director, in opposition to Plaintiffs motion, and in support of its cross-motion relies on the Ithaca Trust Rule. As stated by the Supreme Court in Ithaca Trust Co. v. United States, subsequent events may not be considered to determine date of death value for assets in the taxable estate. 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929). The Director contends that “plaintiff is not the first estate to witness a substantial decrease in value of stocks or other investments after decedent’s date of *368 death” and that courts have rejected change of value. See Ithaca Trust Co., 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929); Walter v. United States, 341 F.2d 182 (6th Cir.1965); First Nat'l Bank of Kenosha v. United States, 763 F.2d 469 (2nd Cir.1941). Thus, the Director asserts that Plaintiffs claim for refund was properly-denied, and that the court should grant summary judgment in favor of Defendant.
B. New Jersey Estate Tax Analysis
Pursuant to N.J.S.A 54:38-l(a)(2)(a)(i), tax is imposed “[u]pon the estate of every resident decedent dying after December 31, 2001 which would have been subject to an estate tax payable to the United States under the provisions of the federal Internal Revenue Code of 1986 (26 U.S.C. § 1 et seq.) in effect on December 31, 2001, the amount of which tax shall be ... the maximum credit that would have been allowable under the provisions of that federal Internal Revenue Code in effect on that date.” Under the Internal Revenue Code (“the IRC”), the unified credit was $220,500 in 2001. 26 U.S.C.A. § 2010 (effective Jan. 1, 1998 to Dec. 31, 2001). This is equivalent to a $675,000 exemption. Ibid. Thus, if a decedent’s net estate falls below $675,000, no New Jersey Estate Tax is owed.
Accordingly, to determine if Plaintiff is liable for New Jersey Estate Tax, the court must consider the federal estate tax law. Primarily, IRC § 2031 provides that the decedent’s gross estate shall include the “value at the time of his death of all property real or personal, tangible or intangible wherever situated.” 26 U.S.C.A. § 2031. Section 20.2031-1(a) defines the gross estate as “the total value of interests described in Sections 2033 through 2044.” 26 C.F.R. § 20.2031-l(a) (2012). Pursuant to § 2033, the decedent’s gross estate includes “the value of all property to the extent of the interest therein of the decedent at the time of his death.” 26 U.S.C.A § 2033. For federal estate tax purposes, value shall mean fair market value, which is defined as “the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to *369 buy or to sell and both having reasonable knowledge of relevant facts.” 26 C.F.R. § 20.2031-l(b) (2012).
In this matter, Decedent had an interest in the IRA at the time of his death. Therefore, the IRA is includable in Decedent’s gross estate under IRC § 2033 because he had an interest in the asset as of his date of death. To determine if the Director properly denied the Estate’s claim for refund, the court considers the federal case law regarding subsequent events and fair market value.
1. Date of Death Valuation and Subsequent Events
According to the Ithaca Trust Rule, events that occur subsequent to the decedent’s death are not considered to determine the date of death value of decedent’s gross estate. See Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929). In Ithaca Trust Co., “the testator’s trust gave the residue of his estate to his wife for life.” Ibid. The trust provided that the wife had the power to use any amount of the principal “necessary to suitably maintain her in as much comfort as she now enjoys.” Ibid. Six months following the testator’s death, the wife died, and the residue was then transferred to charities. Ibid. The issue before the Court was “whether the amount of the diminution, that is, the length of the postponement, is to be determined by the event as it turned out, of the widow’s death within six months, or by mortality tables showing the probabilities as they stood on the day when the testator died.” Id. at 155, 49 S.Ct. 291. To determine the proper charitable deduction for estate tax purposes, the Court found that the estate should have reduced the charitable contribution of the residue “by the wife’s probable life span as it existed at the testator’s death.” Ibid. The Court opined that “tempting as it is to correct uncertain probabilities by the now certain fact, we are of the opinion that it cannot be done, but that the value of the wife’s life interest must be estimated by the mortality tables.” Ibid, at 155, 49 S.Ct. 291.
For federal estate tax purposes, the progeny of Ithaca Trust have predominantly held that valuation of an interest in *370 property is made as of the decedent’s date of death without consideration of any event that occurs after that date. “Whether evidence relating to subsequent events is admissible in determining the fair market value of property on an earlier date is an issue of relevance. Most subsequent events are not relevant because ‘the measure of the tax must be determined according to the situation as it existed on the date [in question], and not according to subsequent events.’ ” Polack v. Commissioner, 366 F.3d 608, 612 (8th Cir.2004) (citing Morris v. Commissioner, 761 F.2d 1195, 1201 (6th Cir.1985) (quoting Walter v. United States, 341 F.2d 182, 185 (6th Cir.1965))). Facts that a hypothetical willing buyer and willing seller “could reasonably have expected to know at the time” of the sale may be considered. Information that a “hypothetical willing buyer could not have known is ... irrelevant to this calculation.” Ibid, (citing First Nat’l Bank of Kenosha v. United States, 763 F.2d 891, 894 (7th Cir.1985); accord Saltzman v. Commissioner, 131 F.3d 87, 93 (2d Cir.1997)). Therefore, “the kind of ‘subsequent event’ that ... is beyond the contemplation of the parties on the relevant valuation date” is inadmissible according to this rule. First Nat’l Bank of Kenosha, 763 F.2d 891, 894 (7th Cir.1985).
However, the Ithaca Trust Rule does not wholly preclude the consideration of subsequent events for estate valuation purposes. In Polack v. Commissioner, the court articulated that “subsequent events that shed light on what a willing buyer would have paid on the date in question are admissible, such as ‘evidence of actual sales prices received for property after the date [in question], so long as the sale occurred within a reasonable time ... and no intervening events drastically changed the value of the property.’ ” 366 F.3d at 608 (citing First Nat’l Bank of Kenosha, supra, 763 F.2d at 894; See Schnorbach v. Kavanagh, 102 F.Supp. 828, 834 (W.D.Mich.1951)). Furthermore, in Noble v. Commissioner, the court opined that “an event occurring after a valuation date, even if unforeseeable as of the valuation date, also may be probative of the earlier valuation to the extent that it is relevant to establishing the amount that a hypothetical willing buyer would have paid a hypothetical willing seller for the subject property as of the *371 valuation date.” T.C. Memo 2005-2 (holding that the “best indici-um of fair market value of decedent’s 11.6 % interest in company’s non-publicly traded stock was price for which majority shareholders purchased decedent’s shares from her estate fourteen months after the valuation date, and the sale price would be adjusted for inflation”).
A sale of decedent’s property subsequent to his death may be relevant to establish that the initial appraisal of fair market value was incorrect, so long as that change was reasonably foreseeable. Gettysburg Nat’l Bank v. U.S., 92-2 U.S.Tax Cas.(CCH) P60, 108 (M.D.Pa.1992) (citing First Nat’l Bank of Kenosha v. United States, 763 F.2d 891, 894 (7th Cir.1985)). In Morrissey v. Commissioner, decedent’s stock was sold by the beneficiaries approximately two months after the alternate valuation date. 243 F.3d 1145 (9th Cir.2001). The Ninth Circuit found that the sales were evidence of fair market value. Ibid. The court opined that “sales between willing and informed buyers and sellers are evidence of fair market value.” Id. at 1149. In Gettysburg Nat’l Bank v. U.S., the court held that the sale of decedent’s property sixteen months after his death was relevant to determine the fair market value because the sale occurred within a reasonable period of time, there was no significant change in the market, and it was an arm’s length transaction. 92-2 U.S.Tax Cas.(CCH) P60 (M.D.Pa.1992). In Estate of Scull v. Commissioner, decedent owned a collection of art work that was not auctioned until almost eleven months after his death. 67 T.C.M. (CCH) 2953 (U.S.Tax Ct.1994). The court determined that the auction prices were evidence of the date of death value of the artwork. Ibid. The court reduced the prices by 15% to account for appreciation of the art market during the eleven months that followed decedent’s passing. Ibid.
In Estate of Necastro v. Commissioner, the U.S. Tax Court granted 34% discount of decedent’s property value due to environmental contamination, where the contamination was not discovered until five years after the valuation date. 68 T.C.M. (CCH) 227 (U.S.Tax Ct.1994). Decedent passed away on October 25, 1985, and the executrix filed the estate tax return on August 19, 1988. *372 Id. Decedent owned property along Old Airport Road in New Castle, Delaware (“the New Castle Property”) prior to and at the time of his death. Id. A salvage yard was located on the New Castle Property. Id. Petitioner filed a Claim for Refund with the Service on August 15, 1990. Id. Petitioner contended that decedent’s property and stock in the corporation were worth less than the amount represented on the Estate Tax Return because environmental expenses on the property were not considered in the valuation of the property. Id. The Delaware Department of Natural Resources and Environmental Control (“DNREC”) regularly monitored the New Castle Property beginning in the early 1980s and did not detect any environmental issues prior to decedent’s passing. Id. The court found that petitioner failed to establish whether the level of solid waste contamination in 1990 was the same in 1985. Id. However, the court granted the petitioner a reduction in value as of date of death due to some of the environmental contamination. Id.
Under Ithaca Trust, the valuation of an estate should generally be determined based upon the situation as that existed as of the date of death without the consideration of subsequent events. However, I concur with the well-established principles set forth in Morrissey, Scull, Gettysburg, and Necastro, which provide that subsequent events may establish evidence of value on the valuation date. These cases are distinctive from Ithaca Trust. The post death sales in Morrissey, Scull, and Gettysburg were not events that changed the value of the assets as in Ithaca Trust, but instead the sales provided evidence of value of the assets on the date of death. Similarly, the discovery of environmental contamination in Estate of Necastro five year’s after the valuation date afforded evidence of value of the New Castle property on the date of death. Thus, I hold that subsequent events may be considered to establish evidence of fair market value as it existed on the date of death.
2. Valuation of the IRA
Fair market value of the IRA is determined by what a hypothetical willing buyer would have paid a willing seller. Facts that a *373 hypothetical willing buyer and willing seller could reasonably have expected to know at the time may be considered to determine date of death value. In support of its motion, Plaintiff contends that a willing buyer would have conducted a due diligence investigation and determined that there were no assets in the IRA. In response, Defendant argues that a willing buyer and willing seller could not possibly have known that the IRA did not contain securities. I aecord greater weight to Plaintiffs argument, as a prudent willing buyer would have undertook a due diligence investigation to determine what assets were in the IRA by requesting supporting documents like stock certificates.
Defendant contends that it is “uncontroverted that the value of the IRA at the time of decedent’s death was $1,463,773.18.” Defendant relies on Walter v. United States in further support of its contention that subsequent events cannot be considered to determine date of death value. In Walter, the court found that the Service properly assessed estate tax on the total value of an irrevocable trust that a decedent established for her granddaughter. 341 F.2d 182 (6th Cir.1965). The decedent retained a general power of appointment. Although she died before exercising that power, the court held that the value subject to tax is that which the grandmother “relinquished or transferred in possession or enjoyment as of the date of her death.” 341 F.2d at 185. Defendant maintains that the value of the IRA cannot be changed from that which was reported on the Estate’s IT-Estate by the discovery of the Madoff Ponzi scheme because it occurred over two years after Decedent’s death. Defendant further argues that the willing buyer and willing seller could not have known of the Madoff Ponzi scheme as of the date of death, and it therefore follows that the Director properly denied plaintiffs refund claim. I reject Defendant’s argument, as the hypothetical willing buyer need not discover the Ponzi scheme, but need only discovery that the Plaintiff had no assets to sell.
I find the cases that the Director relies upon to be distinctive from the case at bar. Decedent’s IRA did not contain cash, securities, bonds, or other investment vehicles, as the trusts did in Ithaca Trust or Walter. FISERV, the custodian of the IRA, did *374 not hold any assets for the Decedent or the Estate. Plaintiff maintains that while the Trust received payments from Madoffs account of money from other investors, it does not change the fact that there were no assets in the IRA at the date of death. I agree.
Subsequent events may be considered to show evidence of value of the estate on the date of death. In the instant matter, approximately 30 months passed from decedent’s death to the arrest of Madoff for his role in the Ponzi scheme. I find this to be a reasonable amount of time. Accordingly, I conclude that the subsequent information regarding the Madoff Ponzi scheme is relevant to the determination of the fair market value of the IRA. The unearthing of the Ponzi scheme exposed that the statements are fictitious. Furthermore, though the public discovery of the Madoff Ponzi Scheme was subsequent to Decedent’s passing, the statements produced by FISERV were fictitious upon creation. The statement produced by FISERV to provide the date of death value of the IRA did not reference any assets in the account, but merely included a “total investment” amount. This information which was acquired subsequent decedent’s death provides evidence that the value of the IRA was worthless on the valuation date.
The FISERV statement produced to show date of death value of Plaintiffs IRA was fraudulent as it existed on the date of death. A date of death value cannot be ascribed to an IRA based upon a fictitious account statement that arbitrarily provides a total value. Furthermore, the IRA did not contain any assets. Ascribing a worthless value to the IRA reduces the total Net Estate to $348,520, which is less than $675,000.[8] Therefore, I conclude that Plaintiff has met its burden to establish that the Director improp *375 erly denied the Estate’s claim for refund because the Net Value of the Estate was below the $675,000 filing threshold.
3. Claim for Refund
Pursuant to N.J.S.A. 54:38-3, an estate is entitled to a refund from the State if it made a tax payment in excess of estate tax due. N.J.S.A. 54:38-3. Taxpayers have three years from payment of the estate tax to file a claim for refund with the Director. Id. Where a taxpayer makes an overpayment of tax attributable to a mistake of fact, a taxpayer may file an amended return to report the correct amount of tax owed. In such cases, so long as the amended return is timely filed, a taxpayer is entitled to a refund of any overpayment of tax. See The Arimex Consolidated Copper Co. v. The State Bd. of Assessors and J. Willard Morgan, Comptroller, 69 N.J.L. 121, 54 A. 244 (1903).
Plaintiff relies on Arimex, which stands for the notion that when a tax payer makes an overpayment based on a mistake of fact the tax payer is entitled to recover the amount overpaid. Ibid. In Arimex, the plaintiff company was assessed a franchise tax of $4,000 based the company’s agent reporting to the state board of assessors that the amount of capital outstanding was $5,000,000. Ibid. After the company paid the tax they discovered that their agent had reported an erroneous figure in that the outstanding capital was actually $2,500,000. Ibid. The company moved to reduce the tax to $2,500. Ibid. The court held that the legal basis for the tax was not on the erroneous return, but on the underlying capital stock and, therefore, the company was entitled to a return of $1,500. Id. at 122, 54 A. 244. The court then held that a payment made on a mistake of fact is not barred from a suit for recovery against any payee or the state. Ibid. Although Arimex is factually dissimilar from the instant matter, the underlying principle is equally applicable. Plaintiff also erroneously reported an inflated value, albeit here for estate tax rather than franchise tax purposes based on a mistaken belief of the value of the IRA invested with Madoff. In both cases the inflated value in which parties paid tax was based on a mistake of fact.
*376 In the instant matter, there are no material facts in dispute. The Net Estate was improperly valued based on fictitious statements produced by FISERV, and it is undisputed that the IRA did not contain any cash or securities. The Estate made a timely claim for refund. As the date of death value of Decedent’s taxable estate falls below the $675,000 threshold filing amount, no estate tax was owed. Therefore, the Estate is entitled to a refund for overpayment of tax based on a mistake of fact, and the Director improperly denied the Plaintiffs claim for refund.
III. Conclusion
For the reasons stated, Plaintiffs motion for summary judgment is granted, and the Defendant’s cross-motion is denied. The Clerk of the Tax Court is ordered to enter judgment in accordance with this opinion.

 Although the Director contends that he has "insufficient information or knowledge to form a belief as to the truth of Plaintiff’s statement that in December 2008 Bernard Madoff was exposed as engaging in the largest Ponzi scheme in U.S. history", the Court finds that in December 2008 the Madoff Ponzi scheme became public. The Director also claims that he has insufficient knowledge to admit that in March 2009, Madoff pled guilty to eleven Federal charges in Federal District Court. The court finds that this is evidenced in Trustee Picard’s Interim Report as provided by Plaintiff in its papers.

 The statement attached to Plaintiff’s motion papers included a “grand total” market value as of May 27, 2006 for the Bernard L. Madoff Brkg Acct. However, the statement failed to provide a detailed list of any purported investments. The statement merely indicates that the market value of the total "investments” as of May 27, 2006 was $1,463,773.18, and that there was $0 cash, cash receivables or cash payables. As indicated at oral argument by Plaintiff, all statements provided by FISERV regarding this IRA were "one line” statements such as this one.

 Neither party produced a copy of Decedent’s last will and testament to the court.

 Payment of taxes for receipt of these distributions is not at issue before this court.

 In In re: Bernard L. Madoff Inv. Sec. LLC, the Second Circuit Court of Appeals found that Trustee Irving Picard properly applied the "Net Investment Method." The Second Circuit recognized that Madoff investor accounts did not hold assets notwithstanding the contents of the account statements which indicated otherwise. In its decision, the Second Circuit noted that Madoff never invested investor funds; Madoff generated fictitious account statements and trading records in order to conceal the fact that it never engaged in any trading activity whatsoever. The Second Circuit went on to note that a customer’s monthly account statement listed securities transactions purportedly executed during the reporting period, but "... a statement did not reflect any actual trading or holdings of securities by Madoff on behalf of the customer.” Brief for the Plaintiff (September 16, 2011).

 See In re: Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229 (2d Cir.2011).

 N.J.S.A. 54:38-1 (a)(2)(i) imposes a tax "[u]pon the transfer of the estate of every resident decedent dying after December 31, 2001 which would have been *364 subject to an estate tax payable to the United States under, the provisions of the Federal Internal Revenue Code of 1986 (26 U.S.C. § et seg.) in effect on December 31, 2001, the amount of which tax shall be ... the maximum credit that would have been allowable under the provisions of that Federal Internal Revenue Code in effect on that date.” In 2001, the unified credit under the Federal Internal Revenue Code was $220,550, which equates to an exemption from estate tax of $675,000. 26 U.S.C.A. § 2010 (effective Jan. 1, 1998 to Dec. 31, 2001).

 The court does not consider the distributions of $273,526.34 to decedent's wife in 2007 and 2008 to be evidence of fair market value of the IRA on the valuation date. Even if the court found that the distributions should be considered to establish fair market value on the valuation date, the Estate is entitled to a refund because the total value of the Net Estate would be $658,146.34.